Filed 5/13/25; Certified for Partial Pub. 6/11/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| WATER AUDIT CALIFORNIA, Plaintiff and Appellant, v. MERCED IRRIGATION DISTRICT, Defendant and Respondent. | F088084 (Super. Ct. No. 22CV-03034) **OPINION** |

APPEAL from a judgment of the Superior Court of Merced County. Brian L. McCabe and Susan J. Matcham,* Judges.

William McKinnon; Law Office of Adam Keats and Adam Keats for Plaintiff and Appellant.

Rob Bonta, Attorney General, Tracy L. Winsor, Assistant Attorney General, Russell B. Hildreth and Jeffrey P. Reusch, Deputy Attorneys General, as Amicus Curiae for the California Department of Fish and Wildlife on behalf of Plaintiff and Appellant.

Duane Morris, Colin L. Pearce, Jolie-Anne S. Ansley and B. Alexandra Jones for Defendant and Respondent.

-ooOoo-

---

*Retired Judge of the Monterey Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A fishway is a device or structure that facilitates the movement of fish over or around a dam.  (See Fish & G. Code, § 5931.)  A fish ladder is a type of fishway.  In simple terms, fish ladders are "water-covered steps" that enable fish to "climb over" dams.  (*Idaho ex rel. Evans v. Oregon* (1983) 462 U.S. 1017, 1021.)  "Designs vary …, but the general principle is the same for all fish ladders:  the ladder contains a series of ascending pools that are reached by swimming against a stream of water.  Fish leap through the cascade of rushing water, rest in a pool, and then repeat the process until they are out of the ladder."  (National Ocean Service, National Oceanic and Atmospheric Administration, U. S. Dept. of Commerce (2024) Ocean Facts <https://oceanservice.noaa.gov/facts/fish-ladder.html>[as of May. 12, 2025]. archived at <https://perma.cc/L6LT-BAWB>.)

This case involves a fish ladder at a dam on the Merced River.  The dam is owned by defendant Merced Irrigation District.  According to the pleadings, the fish ladder has been closed for decades.

Fish and Game Code section 5935 states, "The owner of any dam upon which a fishway has been provided shall keep the fishway in repair and open and free from obstructions to the passage of fish at all times."  Section 5936 of the same code prohibits willfully obstructing "any fishway."  Merced Irrigation District alleges it is unable to comply with these statutes without the direction and consent of other government agencies.

Plaintiff Water Audit California is a nongovernmental organization seeking to enforce the fishway statutes as a private attorney general.  Plaintiff alleges Merced Irrigation District has the sole duty and ability to comply with the statutes.  Accordingly, and because the fish ladder remains closed and obstructed, plaintiff filed a superior court action for public nuisance and traditional mandamus relief.

This appeal is taken from a judgment of dismissal.  The judgment was entered after a demurrer to the third amended complaint and petition for writ of mandate was

2.

sustained without leave to amend. The cause of action for public nuisance was dismissed "for failure to join indispensable parties." The writ petition was deemed untimely based on an unspecified statute of limitations. The trial court's explanation was that plaintiff failed to allege "a specific action by a specific agency occurring on a specific date that is not time barred."

"Appellate courts affirm a judgment of dismissal if it is correct on any ground stated in the demurrer, independent of the trial court's stated reasons." (*Bichai v. Dignity Health* (2021) 61 Cal.App.5th 869, 877.) We conclude the public nuisance claim was properly dismissed on another ground asserted in the demurrer: lack of standing. A private party lacks standing to bring a public nuisance action unless it has suffered a special injury different in kind from the harm suffered by the general public. (Civ. Code, § 3493.) Plaintiff did not adequately plead such an injury. Despite defendant's pointed argument on this issue, plaintiff does not substantively address it. The judgment will thus be affirmed as to the cause of action for public nuisance.

Regarding the writ petition, we conclude plaintiff has pleaded a basis for invoking the continuous accrual doctrine. Judicially recognized theories of continuous accrual prevent "the inequities that would arise if the expiration of the limitations period following a first breach of duty or instance of misconduct were treated as sufficient to bar suit for any subsequent breach or misconduct." (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1198.) This allows plaintiffs to "pursue actionable wrongs for which the statute of limitations has not yet expired, even if earlier wrongs would be barred." (*Orange County Water Dist. v. Sabic Innovative Plastics US, LLC* (2017) 14 Cal.App.5th 343, 395.) Although generally reserved for cases involving "recurring" acts of wrongdoing, the focus is on whether the duty allegedly breached is "a continuing one" that is "*susceptible* to recurring breaches." (*Aryeh*, at p. 1200, italics added.)

Merced Irrigation District argues it had a legal excuse for closing the fish ladder in 1970. Regardless of whether that is true, there remains a factual dispute about if and

when any legal justification for keeping the fishway closed ceased to exist. Even if we assume the initial closure triggered a statute of limitations, there are disputed factual issues regarding whether a duty to reopen the fish ladder (and breach of that alleged duty) arose closer in time to the filing of plaintiff's lawsuit. Moreover, defendant's own evidence shows it reopened and then reclosed the fish ladder after the lawsuit commenced but shortly before the third amended pleading was filed. Therefore, if necessary, plaintiff could plead supplemental allegations of a fresh breach of the alleged duty within any applicable limitations period.

Merced Irrigation District argues there are other grounds for affirming the entire judgment, including nonjoinder of necessary and indispensable parties. In making those arguments, it relies on the truth and subjective interpretation of matter contained in documents of which the trial court took judicial notice. The evidence was not judicially noticeable for those purposes, and it does not establish Merced Irrigation District's various defenses as a matter of law at the pleading stage. The judgment will be reversed as to the dismissal of the petition for writ of mandate.

## FACTUAL AND PROCEDURAL BACKGROUND

We preliminarily note both parties' extensive reliance on material outside the pleadings, even in their summaries of the "factual" background. Early versions of plaintiff's complaint/petition were accompanied by contemporaneously filed attorney declarations that authenticated multiple documents. We assume the attachments to the declarations were intended to constitute exhibits to the pleadings. The operative third amended pleading, however, was filed without a supporting declaration or any exhibits.

"An 'amended' complaint supersedes all prior complaints. '"It alone will be considered by the reviewing court."' [Citation.] The original ceases to '"perform any function as a pleading."' [Citation]." (*Lee v. Bank of America* (1994) 27 Cal.App.4th 197, 215, citing and quoting *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 884.) The only exception is the sham pleading doctrine, under which "plaintiffs are

4.

precluded from amending complaints to omit harmful allegations, without explanation, from previous complaints to avoid attacks raised in demurrers or motions for summary judgment." (*Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 425.)

In light of the above principles, there are few pleaded facts to summarize. The operative pleading is 26 pages long, but it is filled with recitals of statutory text, legal arguments with case citations, and conclusory legal assertions. All quotations in the following summary are taken from the operative pleading. All locations and distances are approximated.

***Pleaded Allegations***

Water Audit California (plaintiff or Water Audit) is a public benefit corporation. (Corp. Code, §§ 5060, 5110 et seq.) It is "dedicated to protecting natural watercourses and the associated life." "Water Audit has repeatedly taken action to protect the public trust in the state of California" and "has an additional and specific interest in the free passage of fish in the waterways of California."

Merced Irrigation District (sometimes defendant or MID) is a public agency. MID owns and operates four dams on the Merced River, including the Crocker-Huffman Dam (C-H Dam). The C-H Dam is also known as the "Crocker-Huffman diversion dam," thus indicating its role in MID's "water delivery system."

Built in 1910, the C-H Dam is located at River Mile 52 of the Merced River. Three miles upstream is the Merced Falls Dam, built in 1901. One mile upstream from Merced Falls Dam is the McSwain Dam, built in 1966. MID's fourth dam, the New Exchequer, is located six miles upstream from the McSwain Dam. The New Exchequer Dam was built in 1967 and forms Lake McClure.

"The upper three dams, [i.e.,] the New Exchequer, McSwain and Merced Falls, are undergoing FERC [Federal Energy Regulatory Commission] relicensing." "The New Exchequer and the McSwain Dams are administered as FERC Project No. 2179, and the Merced Falls Dam as FERC Project No. 2467. [Citation.] [¶] This matter concerns only

the [C-H Dam], [citation] which is not subject to the federal jurisdiction of FERC review." (Boldface omitted.)

The statements in the previous paragraph necessarily imply that the C-H Dam does not generate hydroelectric power. The relevance of this fact, and of the quoted statements, will be explained later in the opinion.

The C-H Dam has a concrete fish ladder. The fish ladder "has been closed since approximately 1972." Consequently, a natural spawning route for anadromous fish is blocked. The C-H Dam is "the most upstream point [on the Merced River that] a salmon or steelhead is able to migrate for spawning purposes." "Central Valley steelhead, federally listed as threatened, occur within the San Joaquin River and likely occur in the Merced River downstream of [the C-H Dam]."

"Although [Merced Irrigation District] knew and knows that its fishway was and is blocking the passage of fish, prior to the initiation of this litigation, no mitigation to abate the inoperable fishway [was] undertaken." "By letter dated August 30, 2022, Water Audit made a demand on [Merced Irrigation District] to reopen the fishway and gave notice of its intention to commence litigation if remediation was not promised." Merced Irrigation District "continues to intentionally block the fishway and has additionally failed to maintain the fishway in good operating condition …."

### Procedural History

In September 2022, plaintiff filed a verified complaint and petition alleging causes of action for declaratory, injunctive, and mandamus relief. Merced Irrigation District was named as the defendant and respondent. An attorney declaration filed in support of the pleading authenticated roughly 200 pages of attached documents "received from NOAA Fisheries in response to a Freedom of Information Act request."[1]

---

[1]"NOAA Fisheries, also known as the National Marine Fisheries Service, is an office of the National Oceanic and Atmospheric Administration within the Department of Commerce." (National Marine Fisheries Service, National Oceanic and Atmospheric Administration, U. S. Dept. of Commerce <https://www.fisheries.noaa.gov/about-us> [as of May. 12, 2025], archived

On November 14, 2022, Merced Irrigation District filed a demurrer. In support of this demurrer, MID requested judicial notice of 12 documents labeled as exhibits A through L. The exhibits consisted of approximately 250 pages of material.

While the demurrer was pending, plaintiff voluntarily amended its pleading. (Code Civ. Proc., § 472, subd. (a).) A verified first amended complaint and petition was filed in January 2023. Plaintiff alleged causes of action for public nuisance, declaratory relief, mandamus relief, and "Violation of the Equal Protection Clause [of the] California Constitution." (Boldface omitted.) In addition to Merced Irrigation District being named as defendant and respondent, the following parties were named as real parties in interest: California Department of Fish and Wildlife; "NOAA Fisheries (NOAA), also known as the National Marine Fisheries Service (NMFS)"; the California State Water Resources Control Board; and the United States Fish and Wildlife Service.

An attorney declaration with attachments was filed in support of the first amended complaint/petition. It was similar to the previous declaration and contained the same documents, plus 30 additional pages of material. With exception of an e-mail from plaintiff's counsel to defendant's counsel, the new material was reportedly obtained "from NOAA Fisheries in response to a Freedom of Information Act request." (See fn. 1, *ante*.)

Defendant withdrew its original demurrer and, in February 2023, filed a demurrer to the first amended pleading. A request for judicial notice was filed in support of the second demurrer. Although nearly identical to the earlier request for judicial notice, this filing intentionally omitted a document previously labeled as "Exhibit J." Documents previously labeled as exhibits "K" and "L" in the prior request were now relabeled as exhibits "J" and "K," respectively.

at <https://perma.cc/E3AR-6GTU>.) The quoted information is confirmed by a document filed in this case by the United States Attorney for the Eastern District of California on behalf of NOAA Fisheries and other federal agencies.

On March 3, 2023, plaintiff filed multiple documents concerning the second demurrer. They included an opposition to the demurrer, a supporting attorney declaration with close to 1,000 pages of exhibits, and a request for judicial notice of those exhibits plus "[a]ll records previously submitted to the Court by Water Audit during this proceeding." In addition, plaintiff filed a request for leave to amend its pleading by deleting the "Equal Protection" cause of action and removing all "Real Party in Interest" allegations. Plaintiff also filed objections to defendant's request for judicial notice.

The request to amend the pleading in advance of the demurrer hearing was never ruled upon. Plaintiff's objections to defendant's request for judicial notice were impliedly overruled. (See further discussion, *post*.) There was no ruling on plaintiff's own request for judicial notice.

The demurrer to the first amended complaint/petition was heard on March 21, 2023. We assume this was an unreported hearing, as there is no corresponding transcript in the appellate record. The minute order indicates the parties argued, and the court deferred its ruling to "do some more research."

On April 11, 2023, the trial court issued a decision by minute order. The court granted defendant's request for judicial notice filed "on November 14, 2022," i.e., the request filed in support of its demurrer to the *original* pleading. Thus, the judicially noticed documents included the original "Exhibit J."[2] The following explanation was provided: "This Court finds that the matters discussed in the above documents [exhibits A through L] constitute official acts of government agencies for which judicial notice is proper pursuant to Evidence Code [section] 452 [subdivisions] (c) & (d) and constitute admissible evidence of the subject actions by such agencies."

---

[2]Defendant's original request for judicial notice describes "Exhibit J" as the "Water Quality Certification for Merced Irrigation District's Merced River Hydroelectric Project and Merced Falls Hydroelectric Project, Project Nos. 2179 and 2467," issued by the California State Water Resources Control Board on or about July 31, 2020. The relevance of this document is explained later in the opinion.

The demurrer to the first amended complaint/petition was sustained as follows:

"The Demurrer for failure to allege exhaustion of administrative remedies or plead around such administrative remedies is SUSTAINED WITH LEAVE TO AMEND.

"The Demurrer brought on the grounds that the Federal Power Act preempts state regulation (See California v. F.E.R.C (1990) 495 U.S. 490, 496-500) is SUSTAINED WITH LEAVE TO AMEND to either plead around preemption or state a claim that is not preempted by the Federal Power Act.

"The Demurrer to the Petition for Writ of Mandate on the grounds that discretionary decisions are not subject to review by Writ of Mandate is SUSTAINED WITH LEAVE TO AMEND.

"The Demurrer on the grounds that the claims regarding the 1970 closing of the fish ladder at issue are time barred is SUSTAINED WITH LEAVE TO AMEND to plead around the statute of limitations.

"The Demurrer on the grounds that declaratory relief is not available to challenge agency action is SUSTAINED WITHOUT LEAVE TO AMEND. The sole remedy for attacking the official actions of an administrative agency is a Petition for Writ of Mandate. [Citations.] Since the basic issue raised in the Complaint/Petition is the application of law by an administrative agency, [the] Cause of Action for Declaratory Relief [does] not and cannot state a cause of action.

"A ruling on the demurrer on the grounds of the doctrine of abstention is DEFERRED AS MOOT given the above rulings [on] the other demurrers raised by Defendant. The doctrine of abstention will be addressed if and when Plaintiff has otherwise stated a valid claim.

"The Demurrer to the Cause of Action for Public Nuisance is SUSTAINED WITH LEAVE TO AMEND to state an act of nuisance by Defendant Merced Irrigation District that was not authorized or permitted by [the California Department of Fish and Wildlife] and other state and federal regulatory agencies.

"The Demurrer to the Cause of Action for violation of the Equal Protection Clause is SUSTAINED WITH LEAVE TO AMENDED [*sic*] to allege a violation of rights of a recognized protected class in a manner unequal to the rights of other classes."

In June 2023, plaintiff filed a verified second amended complaint and petition. The alleged causes of action were for public nuisance and mandamus. This pleading named only Merced Irrigation District as defendant and respondent. No real parties in interest were identified. The record does not show any exhibits or supporting declarations were filed.

Merced Irrigation District filed another demurrer and another request for judicial notice. The request for judicial notice was substantively identical to the one previously filed in support of the demurrer to the first amended complaint and petition.

In July 2023, plaintiff requested a continuance of the demurrer hearing due to a reported possibility Merced Irrigation District would reopen the fish ladder in the near future. The trial court granted the request. Plaintiff later filed an opposition to the demurrer.

On October 26, 2023, the demurrer to the second amended complaint/petition was heard and argued. This is the only reported hearing in the appellate record. During the hearing, plaintiff's counsel alleged the fish ladder was "opened on a temporary basis about a month ago, but then [Merced Irrigation District] reclosed it, and it remains closed." Later, the trial court questioned plaintiff's counsel about defendant's joinder arguments: "And is it your argument that MID has autonomy to act irregardless of any effect on the Endangered Species Act, Clean Water Act or any other act; is that your contention?" Although such autonomy had already been alleged in the pleadings and earlier in the oral argument, the attorney would only say MID had a "duty to reopen the fishway." The trial court accused plaintiff's counsel of "skirting the question." Plaintiff's counsel eventually admitted it was "conceivable" that reopening the fishway could implicate the Endangered Species Act, but also noted defendant had failed to identify "any portion of the Endangered Specifies Act or the Fish and Game Code that excuses [it] from performance."

The October 2023 hearing concluded with an oral ruling sustaining the demurrer with leave to amend to "add the indispensable parties." The minute order identified only one defect in the pleading: "[F]ailure to name indispensable parties, specifically CDFW [California Department of Fish and Wildlife], FERC [Federal Energy Regulatory Commission], USFWS [United States Fish and Wildlife Service], and NMFS [National Marine Fisheries Service]."

In December 2023, plaintiff filed a verified third amended complaint and petition. Two causes of action were alleged: one for public nuisance and the other for traditional mandamus. Merced Irrigation District was named as defendant and respondent, and four parties were named as real parties in interest: California Department of Fish and Wildlife; "NOAA Fisheries (NOAA), also known as the National Marine Fisheries Service (NMFS)"; the United States Fish and Wildlife Service; and the Federal Energy Regulatory Commission. The record does not show any supporting declarations or exhibits were filed.

Merced Irrigation District responded with another demurrer. The California Department of Fish and Wildlife did not file a response. The federal agencies named as real parties in interest filed a document entitled, "Special Appearance Contesting Jurisdiction re: Non-Waiver of Sovereign Immunity…."

The federal agencies declined to consent to being named in the lawsuit. They warned they would remove the case to federal court and then move for dismissal. The special appearance filing also included the following explanation: "Under California law, a real party in interest, although not a nominal party, may be bound by the judgement for *res judicata* purposes, [citations], and under certain circumstances may incur other liabilities such as payment of attorney fees." The last statement presumably alluded to Water Audit's pleaded intention to seek "reasonable attorney fees according to the California Code of Civil Procedure, section 1021.5, and other provisions of law." (Italics omitted.)

11.

In January 2024, the parties stipulated to dismissing the federal agencies.  The trial court accepted the stipulation and ordered those parties dismissed.  The California Department of Fish and Wildlife remained in the case as a named real party in interest.

In support of its final demurrer, MID requested judicial notice of approximately 270 pages of documents.  Some of the documents were judicially noticed earlier in the case, while others had only come into existence in recent months.  The trial court never ruled on the request.

Plaintiff's opposition to the demurrer included a "Table of Exhibits" listing nearly all evidence it had filed up to that point, including exhibits to the earlier pleadings.  It appears plaintiff believed or assumed the trial court had granted its prior request for judicial notice of the exhibits and other documents.  (See Evid. Code, § 456.)  The record does not expressly indicate whether the trial court considered any of plaintiff's evidence in ruling on defendant's final demurrer.

The final demurrer was not argued.  By a minute order issued on February 22, 2024, the demurrer was sustained without leave to amend.  The stated grounds were as follows:

> "The Demurrer [to the first cause of action, i.e., public nuisance,] is SUSTAINED WITHOUT LEAVE TO AMEND for failure to join indispensable parties, a defect that does not appear to be curable by amendment given the January 19, 2024 Stipulation and Order Dismissing Federal Agencies NOAA FISHERIES AKA NATIONAL MARINE FISHERIES SERVICE (NOAA/NMFS), UNITED STATES FISH and WILDLIFE SERVICE (USFWS or FWS), [and] FEDERAL ENERGY REGULATORY COMMISSION (FERC) BASED ON LACK OFA-JURISDICTION.  [*Sic*.]

> "The Demurrer [to the second cause of action, i.e., the petition for writ of mandate,] is SUSTAINED WITHOUT LEAVE TO AMEND. Despite Fourt [*sic*] opportunities, Plaintiff has failed to state a cause of action for Writ of Mandate addressing a specific action by a specific agency occurring on a specific date that is not time barred."

A judgment of dismissal was entered in March 2024.  Plaintiff's timely notice of appeal was filed in May 2024.  The initial appellate briefing was completed in January 2025.

The California Department of Fish and Wildlife requested permission to file an amicus curiae brief in support of plaintiff's appeal.  The request was granted, and the brief was filed on March 3, 2025.  Merced Irrigation District filed a 37-page response to the amicus brief.

## DISCUSSION

## I.      Public Nuisance

### A.      Standard of Review

"In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory."  (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.)  All "properly pleaded material facts" are accepted as true, but no weight is given to conclusory allegations of fact or law.  (*Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 395.)  "The plaintiff has the burden of showing that the facts pleaded are sufficient … and overcoming all of the legal grounds on which the trial court sustained the demurrer, and if the defendant negates any essential element, we will affirm the order sustaining the demurrer as to the cause of action."  (*Martin v. Bridgeport Community Assn., Inc*. (2009) 173 Cal.App.4th 1024, 1031.)

"If a complaint is insufficient on any ground properly specified in a demurrer, an order sustaining the demurrer must be upheld even though the particular ground upon which the court sustained it may be untenable."  (*Irwin v. City of Manhattan Beach* (1966) 65 Cal.2d 13, 20; accord, *Hendy v. Losse* (1991) 54 Cal.3d 723, 742.)  "Where the demurrer was sustained without leave to amend, we consider whether the plaintiff could cure the defect by an amendment."  (*T.H. v. Novartis Pharmaceuticals Corp*., *supra*, 4

13.

Cal.5th at p. 162.)  It is the plaintiff's burden, however, to explain how the defect can be cured.  (*Ibid.*; *Hendy*, at p. 742.)  When no amendments are proposed, the issue may be treated as forfeited.  (See *Webb v. City of Riverside* (2018) 23 Cal.App.5th 244, 251; *Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43–44; see generally *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 [appellate courts are not required to make arguments for the parties].)

### B.    Law and Analysis

A nuisance is defined as anything "injurious to health, …or … indecent or offensive to the senses, or an obstruction to the free use of property, … or [that] unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway." (Civ. Code, § 3479.)  Therefore, the pollution, obstruction, or diversion of a waterway may legally constitute a nuisance.  (*Helix Land Co. v. City of San Diego* (1978) 82 Cal.App.3d 932, 949.)

Actionable nuisances are classified as public, private, or both.  (*Mendez v. Rancho Valencia Resort Partners, LLC* (2016) 3 Cal.App.5th 248, 261–262.)  Plaintiff alleges only a public nuisance.  "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (Civ. Code, § 3480.)

The trial court dismissed the nuisance claim for failure to join indispensable parties.  For reasons explained *post*, its conclusion appears based on legal errors that include judicially noticing defendant's evidence for its truth and improperly weighing the evidence to make factual findings.  Defendant argued additional grounds, however, including lack of standing.  "Standing is the threshold element required to state a cause of action and, thus, lack of standing may be raised by demurrer." (*Martin v. Bridgeport*

14.

*Community Assn.*, *Inc.*, *supra*, 173 Cal.App.4th at p. 1031; accord, *Tarr v. Merco Constr. Engineers*, *Inc.* (1978) 84 Cal.App.3d 707, 713 [standing may be challenged by general demurrer].)

"[T]he public nuisance doctrine in California is 'aimed at the protection and redress of community interests.' [Citation.] To avoid a multiplicity of actions regarding the invasion of such common rights, public nuisances are generally remedied by designated public prosecutors, with a limited exception for suits by private individuals in exceptional circumstances." (*Rincon Band of Luiseño Mission Indians etc. v. Flynt* (2021) 70 Cal.App.5th 1059, 1103, italics omitted.) The ability of private parties to sue for public nuisance is restricted by statute. "A private person may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise." (Civ. Code, § 3493; see Code Civ. Proc., § 731.) This means private plaintiffs "must adequately allege the existence of a nuisance affecting the community at large, and also that they sustained a special injury, distinct in some way from the more general public harm." (*Flynt*, at p. 1102.)

Plaintiff argues it has standing because of its "special status" as "a public benefit corporation dedicated to protecting natural watercourses and the associated life." The argument is made without supporting authority, and it fails to persuade. "A public-nuisance-abatement action must be prosecuted by a governmental entity and may not be initiated by a private party unless the nuisance is personally injurious to that private party." (*County of Santa Clara v. Superior Court* (2010) 50 Cal.4th 35, 55.) "The damage suffered must be different in kind, not merely in degree, from that suffered by other members of the public." (*Kempton v. City of Los Angeles* (2008) 165 Cal.App.4th 1344, 1349.)

"Code of Civil Procedure section 731 confers standing only on private persons, as opposed to the enumerated public prosecutors, 'whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance.'" (*Rincon Band of Luiseño Mission*

*Indians etc. v. Flynt*, *supra*, 70 Cal.App.5th at p. 1103.) In other words, "the types of harms one would expect those in the community affected by the alleged nuisance to suffer." (*Ibid*.) The record indicates plaintiff is based in Napa, California. The pleadings do not identify any real property interests in the community where the alleged nuisance is located, nor any particular connection to that community or even the Central Valley. Plaintiff essentially claims to have standing because it cares more about California's rivers and fish than other members of the general public. If personal passions were sufficient, the statutory restrictions could always be circumvented by forming an interest group and publishing a mission statement tailored to the subject matter.

The case of *Hacala v. Bird Rides, Inc*. (2023) 90 Cal.App.5th 292 illustrates legitimate private party standing. There, a defendant's business model allowed people in Los Angeles to rent motorized scooters using a "smartphone 'app.'" The company was able "to control, unlock, and rent its scooters to customers who downloaded the app from [its] website." (*Id*. at p. 300.) Customers could "pick up and leave scooters at any public location without the inconvenience of retrieving or returning the scooters to a designated docking location." (*Ibid*.) The scooters were sometimes discarded in a careless manner, which allegedly affected "'a considerable number of people by creating tripping hazards.'" (*Id*. at p. 324.) The *Hacala* plaintiff had standing to bring a claim for public nuisance because she tripped over a scooter on a sidewalk, "fell, and sustained serious physical injuries." (*Id*. at pp. 300; see *id.* at p. 327 ["We conclude the allegations are sufficient to state a private action for public nuisance to redress this personal injury"].)

We note the operative complaint alleges plaintiff's expenditure of "approximately $250,000 on scientists, technologists and counsel in an attempt to understand [Merced Irrigation District's] unlawful injury to the free passage of fish" constitutes a special injury that meets the standing requirement. Plaintiff does not discuss this theory in its briefing, which is reason enough to disregard it. (See *Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 656 ["The appellant may not simply incorporate by reference

16.

arguments made in papers filed in the trial court, rather than briefing them on appeal"].)

Two cases are cited in the complaint, *Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125 and *Tesoro Refining & Marketing Co. LLC v. City of Long Beach* (C.D.Cal. 2017) 334 F.Supp.3d 1031, but "citing cases without any discussion of their application to the present case results in forfeiture." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) Although it is unnecessary, we will explain why neither case is supportive.

In *Mangini*, the owners of 2,400 acres of land in Sacramento County sued parties who had "leased the property from prior owners and who allegedly contaminated the property with hazardous waste during the leasehold." (*Mangini v. Aerojet-General Corp.*, *supra*, 230 Cal.App.3d at p. 1130.) The civil complaint alleged the defendants were liable for creating a public and private nuisance. (*Id.* at p. 1132.) One of several issues on appeal was whether a demurrer to the public nuisance claim was properly sustained for failure to allege a special injury. The appellate court reversed based on allegations of financial obligations imposed upon the plaintiffs as a result of the defendants' conduct. The plaintiffs alleged they were "compelled" and "required" by local government authorities "to undertake testing of the property." (*Id.* at pp. 1132, 1138.) The testing costs were held to constitute a "'special injury'" under Civil Code section 3493. (*Mangini*, at p. 1138.) The key distinction here is Water Audit's failure to allege compelled or unavoidable expenditures as opposed to voluntary spending in furtherance of its litigation objectives.

In *Tesoro*, the plaintiffs had ownership interests in a property (the Site) that was contaminated by chemical pollutants. (*Tesoro Refining & Marketing Co. LLC v. City of Long Beach*, *supra*, 334 F.Supp.3d at pp. 1039–1040.) The lawsuit alleged multiple defendants were responsible for the contamination and liable for public nuisance. In moving to dismiss the claim, the defendants argued "that Plaintiffs' only alleged unique harm is the costs associated with cleanup of the Site, which, according to the

17.

[defendants], Plaintiffs [had] voluntarily assumed." (*Id*. at p. 1053.) But it was "undisputed that a public entity … [had] ordered the cleanup and remediation of the Site." (*Id*. at p. 1054.) The district court ruled there were sufficient allegations the plaintiffs "did not voluntarily assume the duty to comply" with the remediation order but were instead legally "bound to do so." (*Id*. at p. 1053.) In other words, they pleaded around the rule "that 'voluntarily incurred costs do not suffice to satisfy the special injury requirement for public nuisance standing.'" (*Id*. at pp. 1053–1054.)

Water Audit cites no authority for the proposition that standing can be manufactured by spending money to explore the possibility of suing the government and calling the expenditures a financial injury. Water Audit does not substantively address the special injury requirement in its appellate briefing, nor does it propose any curative amendments. It references the public trust and private attorney general doctrines, but cites no authority suggesting either provide an exception to the standing requirement of Civil Code section 3493. Failure to provide legal authority and analysis to support a contention forfeits the contention. (*Ewald v. Nationstar Mortgage*, *LLC* (2017) 13 Cal.App.5th 947, 948.) Therefore, Water Audit has not met its burden to show reversible error in the dismissal of its cause of action for public nuisance.

## II.     The Petition for Writ of Mandate

### A.     Legal Overview

The following information is essential to understanding the parties' arguments concerning the writ petition, especially the issue of necessary and indispensable parties.

By enactment of the Federal Power Act (16 U.S.C. §§ 791a-828c) (sometimes FPA), Congress centralized the process for licensing hydroelectric facilities "by establishing one federal agency as gatekeeper for most hydropower developments:  the Federal Power Commission," now known as the Federal Energy Regulatory Commission (FERC). (*Allen v. United States* (E.D.Mich. 2021) 572 F.Supp.3d 411, 419.) The

Federal Power Act "makes it unlawful for any person, State, or municipality to 'construct, operate, or maintain' a hydroelectric power project that is within FERC's jurisdiction without a valid license from FERC or a federal permit issued prior to 1920." (*City of Oswego, N.Y. v. F.E.R.C.* (D.C. Cir. 1996) 97 F.3d 1490, 1492, quoting 16 U.S.C. § 817(1); see *S. D. Warren Co. v. Maine Bd. of Environmental Protection* (2006) 547 U.S. 370, 373.) In short, most parties "seeking to construct, operate or maintain a hydroelectric power facility must obtain a license from FERC." (*High Country Resources v. F.E.R.C.* (9th Cir. 2001) 255 F.3d 741, 742; see *Turlock Irrigation Dist. v. FERC* (D.C. Cir. 2022) 36 F.4th 1179, 1181 & fn. 1 [explaining FERC has licensing authority over "private, municipal and State hydroelectric projects subject to federal jurisdiction" but not "[f]ederally-owned hydroelectric projects"].)

"Project" is a defined term in the Federal Power Act.[3] The parties' use of this term in the pleadings and briefs impliedly refers to the FPA definition. The operative pleading impliedly alleges, and plaintiff's briefs explicitly contend, that the C-H Dam is not part of any FERC-licensed projects. Merced Irrigation District concedes this is true. The issue relates to the parties' ostensible dispute over whether other government agencies control MID's ability to reopen the C-H Dam fish ladder. Under the FPA, FERC's licensing authority is generally limited to hydroelectric projects and "project works," with the latter term defined as "the physical structures of a project" (16 U.S.C. § 796(12)). (*Allen v. U. S.* (6th Cir. 2023) 83 F.4th 564, 570; see *Niagara Mohawk*

---

[3] "'[P]roject' means complete unit of improvement or development, consisting of a power house, all water conduits, all dams and appurtenant works and structures (including navigation structures) which are a part of said unit, and all storage, diverting, or forebay reservoirs directly connected therewith, the primary line or lines transmitting power therefrom to the point of junction with the distribution system or with the interconnected primary transmission system, all miscellaneous structures used and useful in connection with said unit or any part thereof, and all water-rights, rights-of-way, ditches, dams, reservoirs, lands, or interest in lands the use and occupancy of which are necessary or appropriate in the maintenance and operation of such unit." (16 U.S.C. § 796(11).)

*Power Corp. v. Hudson River-Black River Regulating Dist*. (2d Cir. 2012) 673 F.3d 84, 95–98.)  "So while the [FPA] empowers FERC to exercise 'operational control' over federal power projects, [citation], non-project facilities that lie outside project boundaries 'remain[] under the jurisdiction of the States.'"  (*City of Salisbury, North Carolina v. FERC* (D.C. Cir. 2022) 36 F.4th 1164, 1171.)

The Federal Power Act authorizes FERC to issue licenses for periods of up to 50 years.  (16 U.S.C. § 799.)  "When any such licenses come up for renewal, the applicant must begin a lengthy and complex relicensing process.  [Citation.]  If FERC does not issue a new license before the expiration of the existing license, FERC is required to issue annual licenses 'to the then licensee under the terms and conditions of the original license'" while the application is pending.  (*Natural Resources Defense Council v. Kempthorne* (E.D.Cal. 2009) 621 F.Supp.2d 954, 974, underscoring omitted.)  Existing licensees are not automatically entitled to receive another long-term license; FERC has numerous options that include taking over the project itself.  (16 U.S.C. §§ 807, 808; *City of Tacoma, Washington v. F.E.R.C.* (D.C. Cir. 2006) 460 F.3d 53, 71.)

"[I]n addition to the power and development purposes for which licenses are issued, [FERC] shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality."  (16 U.S.C. 797(e).)  Simply stated, "FERC must consider environmental issues when deciding whether to issue hydropower licenses."  (*U. S. Dept. of Interior v. F.E.R.C.* (D.C. Cir. 1992) 952 F.2d 538, 543.)

The Federal Power Act "specifies that each project license shall include conditions for the protection, mitigation and enhancement of fish, wildlife and related spawning grounds and habitat, based on recommendations received from various federal and state fish and wildlife agencies."  (*State of Cal. v. F.E.R.C.* (9th Cir. 1992) 966 F.2d 1541,

1547, citing 16 U.S.C. § 803(j).)  The federal agencies are the National Marine Fisheries Service (see fn. 1, *ante*) and the United States Fish and Wildlife Service.  (16 U.S.C. § 803(j)(1).)  In California, the relevant state agencies include the Department of Fish and Wildlife.  (See, e.g., *California v. FERC* (1990) 495 U.S. 490, 495.)

As stated in footnote 1, *ante*, the National Marine Fisheries Service (sometimes NMFS) is part of the Department of Commerce.  The United States Fish and Wildlife Service (sometimes USFWS) is part of the Department of the Interior.  Consulting with these agencies is required not only by the Federal Power Act, but other federal laws, including the Endangered Species Act (sometimes ESA).  (See 16 U.S.C. § 1536; 50 C.F.R. § 402.14 (2025); *Conservation Congress v. Finley* (9th Cir. 2014) 774 F.3d 611, 615.)  "The [USFWS] administers the ESA with respect to species under the jurisdiction of the Secretary of the Interior, while the National Marine Fisheries Service (NMFS) administers the ESA with respect to species under the jurisdiction of the Secretary of Commerce."  (*National Assn. of Home Builders v. Defenders of Wildlife* (2007) 551 U.S. 644, 651.)

The California Department of Fish and Wildlife (sometimes CDFW) is part of the California Natural Resources Agency.[4]  (Fish & G. Code, § 700, subd. (a).)  CDFW administers and enforces the Fish and Game Code "through regulations adopted [by CDFW], except as otherwise specifically provided by [that] code."  (*Id*., § 702.)  CDFW is separate and distinct from the Fish and Game Commission, though the latter is also part of the Natural Resources Agency.  (*Id*., § 101; *Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 205.)

---

[4]Prior to 2013, CDFW was known as the Department of Fish and Game.  (*Coastside Fishing Club v. California Fish & Game Com*. (2013) 215 Cal.App.4th 397, 405, fn. 2.) "Whenever the term 'Department of Fish and Game' appears in a law, the term means the 'Department of Fish and Wildlife.'"  (Fish & G. Code, § 700, subd. (c).)

Although FERC must consider and give weight to agency recommendations on licensing conditions, it is not ordinarily bound to adopt them. (See 16 U.S.C. § 803(j)(2); *California v. FERC*, *supra*, 495 U.S. at pp. 499–500.) The Federal Power Act contains a specific provision, however, that *requires* FERC to impose conditions for "the construction, maintenance, and operation" of "such fishways as may be prescribed by the Secretary of Commerce … or the Secretary of the Interior." (16 U.S.C. § 811.) Therefore, if FERC has licensing authority over a dam, the USFWS and NMFS have the ability to require fish passage measures as a condition of licensure. (*Wisconsin Power & Light Co. v. F.E.R.C.* (D.C. Cir. 2004) 363 F.3d 453, 460; *American Rivers v. F.E.R.C.* (9th Cir. 1999) 201 F.3d 1186, 1206–1210.)

Another exception to FERC's broad authority over licensing conditions is imposed by the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), better known as the Clean Water Act. "Section 401 of the Clean Water Act [33 U.S.C. § 1341] 'requires States to provide a water quality certification before a federal license or permit can be issued for activities that may result in any discharge into intrastate navigable waters.' [Citation.] States may adopt water quality standards that are more stringent than federal law requires, and any limitation included in the state certification becomes a condition on any federal license." (*California State Water Resources Control v. FERC* (9th Cir. 2022) 43 F.4th 920, 924, quoting *PUD No. 1 of Jefferson Cnty. v. Wash. Dept. of Ecology* (1994) 511 U.S. 700, 707.) "A FERC hydroelectric license thus is ineffective until the relevant state issues or waives a water quality certification, [citation], which may impose conditions to control pollution or implement other state laws." (*City of Salisbury, North Carolina v. FERC*, *supra*, 36 F.4th at p. 1166.) In California, water quality certifications are issued by the State Water Resources Control Board (sometimes SWRCB). (See *County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 623.)

## B. The Parties' Evidence and Related Contentions

### 1. *Applicable Law re: Judicial Notice*

Merced Irrigation District argues the "actual facts presented to the trial court and subject to judicial notice directly contradict [plaintiff's] factual allegations and legal claims …." MID also submits that we "'may take judicial notice of facts not subject to judicial notice by the trial court.'" We are unsure of what MID is suggesting, but the limitations on judicially noticing documents for the truth of their contents apply to both trial courts and appellate courts.[5]

"In ruling on a demurrer, a court may consider facts of which it has taken judicial notice. [Citation.] This includes the existence of a document. When judicial notice is taken of a document, however, the truthfulness and proper interpretation of the document are disputable." (*StorMedia Inc. v. Superior Court* (1999) 20 Cal.4th 449, 456, fn. 9.)

The same restriction applies when judicial notice is taken of official acts and government records. (Evid. Code., § 452, subds. (c), (d).) Most of the documents of which the trial court expressly took judicial notice are letters authored by, and exchanged between, government agency officials. "Although we could take judicial notice of the existence, content, and authenticity of such letters, doing so would not establish the *truth* of critical factual matters asserted in those documents." (*People v. Castillo* (2010) 49 Cal.4th 145, 157, fn. omitted.)

In filings below, defendant argued certain documents were subject to the hearsay exception described in Evidence Code section 1280 for writings "made by and within the scope of duty of a public employee." (*Id.*, subd. (a).) The argument was misguided. Evidence Code section 1280 generally concerns admissibility of evidence

---

[5]The quote relied upon by MID comes from *People v. Superior Court* (*J.C. Penney Corp., Inc.*) (2019) 34 Cal.App.5th 376 at pages 386–387, citing *Taliaferro v. County of Contra Costa* (1960) 182 Cal.App.2d 587 at page 592. What *Taliaferro* actually says is, "An appellate court may judicially notice a fact even though the record does not show that notice thereof was taken by the trial court." (*Taliaferro*, at p. 592.)

notwithstanding the hearsay rule; judicial notice is a separate issue. When judicial notice is taken of an official act, "what is being noticed is the *existence* of the act, not that what is asserted in the act is true. [Citation.] The truth of any factual matters that might be deduced from official records is not the proper subject of judicial notice." (*Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 885; accord, *In re Vicks* (2013) 56 Cal.4th 274, 314.)

Lastly, we address the lack of rulings on plaintiff's request for judicial notice and some of defendant's requests for judicial notice. "If the trial court denies a request to take judicial notice of any matter, the court shall at the earliest practicable time so advise the parties and indicate for the record that it has denied the request." (Evid. Code, § 456.) Since no such advisements were given in this case, we assume all requests for judicial notice were granted. (E.g., *Casey v. Hill* (2022) 79 Cal.App.5th 937, 975, fn. 16; *Aaronoff v. Martinez-Senftner* (2006) 136 Cal.App.4th 910, 919.)

The following summary of the parties' *evidence* is unfortunately necessary to explain their arguments regarding the grounds asserted on *demurrer*. We do not assume the truth of these purported facts. Insofar as either party may complain some statements constitute uniformed or otherwise erroneous interpretations of the evidence, such complaints only illustrate why the purposes for which judicially noticed documents can be used are limited.

### 2. *Factual Contentions Based on Evidence Outside the Petition*[6]

The operative pleading alleges the "New Exchequer and the McSwain Dams are administered as FERC Project No. 2179, and the Merced Falls Dam as FERC Project

---

[6]Parenthetical citations to "MID RJN" indicate defendant's request for judicial notice in support of its demurrer to the operative pleading. Parenthetical citations to "WAC RJN" indicate plaintiff's request for judicial notice filed in opposition to MID's demurrer to the first amended complaint/petition. Because plaintiff's evidence was attached to various declarations filed by its attorney, William McKinnon, further citations to the date and exhibit will be provided. For example, "WAC RJN, McKinnon Dec. [3/3/23], Ex. N" refers to plaintiff's request for judicial notice of the document marked as Exhibit N attached to the Declaration of William McKinnon

No. 2467." These projects are also respectively known as the "Merced River Project" and "Merced Falls Project." (MID RJN, Ex. A) Long-term licenses for these projects were issued by the Federal Power Commission (FERC's predecessor) in 1964 and 1969, respectively. (MID RJN, Ex. E & "Exhibit J" to MID's original RJN) Both licenses expired in 2014, and the projects have since been operated pursuant to annual licenses.

The Merced Falls Dam was previously owned by Pacific Gas and Electric Company (PG&E). (MID RJN, Ex. G & "Exhibit J" to MID's original RJN) A transfer of ownership from PG&E to Merced Irrigation District reportedly occurred in 2017. ("Exhibit J" to MID's original RJN) The Merced Falls Dam has a fish ladder, which is not to be confused with the fish ladder at the downstream C-H Dam. (MID RJN Exs. A, C)

As noted, the Merced Falls Project was federally licensed in 1969. In 1971, a series of letters were exchanged between state and federal agencies regarding the fish ladder at the Merced Falls Dam (then owned by PG&E). A letter dated March 25, 1971, from the California Department of Fish and Game (see fn. 4, *ante*) to PG&E contained the following statements by the department's regional manager:

> "… There is no reason that Pacific Gas and Electric Company should continue passing water over the fish ladder on the Merced Falls Dam as long as fish water releases are provided past Merced Falls Dam in accordance with those releases specified on the Merced Irrigation District's license for [the Merced River Project]. Requirement for fish water in the ladder at Merced Falls Dam had a value before McSwain Reservoir was constructed; now there is no spawning area available above Merced Falls.

> "The Department of Fish and Game has also requested the Merced Irrigation District to make the fish ladder on their Crocker Huffman Dam inoperable, so that salmon would not pass this ladder but turn into a spawning channel which has been constructed. This is part of the program to restore salmon runs in the Merced River. [¶] We suggest that you notify

filed March 3, 2023. In some instances the same document was proffered by both parties, which will not always be indicated.

25.

the Federal Power Commission that the Department of Fish and Game no longer requires this release of water over the fish ladder at Merced Falls Dam." (MID RJN, Ex. L)

In a letter dated June 22, 1971, from the Department of the Interior to the Federal Power Commission, a deputy assistant to the Secretary of the Interior wrote that the Secretary had "no objection to discontinuing operation of the fish ladder at the Merced Falls dam." (MID RJN, Ex. D) Six weeks later, the Federal Power Commission sent a letter to PG&E that stated, in relevant part, "The proposed action of making the Merced Falls dam fishway inoperable … hereby is approved by the Commission." (MID RJN, Ex. C)

Defendant relies on the 1971 letters for the truth of all statements therein. The letter from the California Department of Fish and Game to PG&E allegedly proves that state officials "ordered" Merced Irrigation District to close the C-H Dam fish ladder in 1970. The other letters are cited as proof "the Department of Interior and the Federal Energy Regulatory Commission … concurred in the closure of the upstream fish ladder at *Merced Falls* Dam."[7] (Italics added.)

In terms of the chronological history, there is a 35-year gap in the parties' evidence. Next in time are excerpts from a 100-page report entitled, "A Feasibility Investigation of Reintroduction of Anadromous Salmonids above Crocker-Huffman Dam on the Merced River." (MID RJN, Ex. B) Dated "December 2007," the report was "prepared for the U.S. Fish and Wildlife Service Anadromous Fish Restoration Program" by a scientist named David Vogel of "Natural Resource Scientists, Inc." This evidence is

---

[7]It is unclear why defendant perceives evidence of federal agency approval regarding the fish ladder at the Merced Falls Dam to be supportive of its positions. There is no dispute FERC has federal licensing jurisdiction over the Merced Falls Dam by virtue of its authority over the Merced Falls Project. We observe defendant proffered no similar evidence regarding the alleged closure of the C-H Dam fish ladder in 1970. The absence of such evidence could be viewed as supportive of plaintiff's argument that because the C-H Dam is not part of a federally licensed project, defendant does not need the permission of any federal agencies to reopen the C-H Dam fish ladder.

26.

heavily relied upon by defendant, and for ease of reference it is hereafter cited as the Vogel study or Vogel report.

The Vogel study included "an examination of the presently [as of 2007] non-functional fishway on [the C-H Dam] to determine measures that would be necessary to modify or replace the fishway should suitable anadromous salmonid habitats be found upstream of the dam and fish were reintroduced into upstream areas." As relevant here, Mr. Vogel concluded the C-H Dam fish ladder has "an outdated design and would probably limit upstream migration of anadromous salmonids if the ladder were made operational (i.e., opening up [water] flow into the ladder). Because operation of the existing ladder would probably cause fish delay or blockage leading to stress or injury, it is likely that one or more new fish ladders meeting modern-day criteria would have to be added to the dam." Relatedly, Mr. Vogel opined that "reintroduction of anadromous salmonids upstream of Crocker-Huffman Dam would be a very difficult measure to successfully implement; the opportunities are few and the constraints are many."

We pause to note the Vogel report was one of the documents Merced Irrigation District argued "[fell] within the hearsay exception for public records" under Evidence Code section 1280. The trial court took judicial notice of the excerpts "and the contents therein," ruling the "documents constitute official acts of government agencies." At best, the Vogel report implies that the United States Fish and Wildlife Service took the official act of commissioning a study. The study was apparently conducted and reported on by one or more independent contractors, i.e., nongovernmental third parties. No aspect of the report upon which defendant relies was judicially noticeable for its truth except, arguably, the fact that the study and report were commissioned by the government.

In November 2008, Merced Irrigation District gave written notice to FERC of its "intent to file an application for a new license for the Merced River Hydroelectric Project," i.e., the project involving the McSwain Dam and New Exchequer Dam. (MID RJN, Ex. E) Thus began a complex relicensing process that defendant contends is still

27.

ongoing more than 16 years later.  In April 2009, PG&E gave FERC written notice of its intent to apply for a new license for the Merced Falls Project.  (MID RJN, Ex. F)

In October 2009, in connection with its Merced River Project relicensing application, defendant filed with FERC a motion to dismiss "the Notices of Study Plan Dispute filed October 5, 2009 by the [USFWS] of the U.S. Department of the Interior, and the [NMFS] of the U.S. Department of Commerce."  (WAC RJN, McKinnon Dec. [1/10/23], Ex. I)  The crux of the matter, in very simple terms, was whether USFWS and/or NMFS had authority to take certain actions in the relicensing process under section 18 of the Federal Power Act.

Section 18 of the FPA (16 U.S.C. § 811) is the previously discussed statute that requires FERC to adopt fishway measures prescribed by USFWS and/or NMFS as a condition of licensing if FERC has licensing authority over the dams in question.  The imposition of such measures for the McSwain and New Exchequer Dams would necessarily presume the availability of fish passage at the downstream C-H Dam, i.e., reopening the C-H Dam fish ladder.  Defendant argued Section 18 of the FPA could not be invoked because, inter alia, FERC had already "found that Crocker-Huffman is not a licensed project facility and, consequently, that [FERC] has '*no authority to alter the operation of Crocker-Huffman,*'" i.e., the C-H Dam.

In Merced Irrigation District's October 2009 motion to FERC, it further argued (as it continues to allege in this case) the C-H Dam fish ladder was "disabled at the direction of the California Department of Fish and Game … in the early 1970s in association with the construction of a salmon spawning channel just downstream of Crocker-Huffman Dam."  MID summarized its position as follows:  "[W]hile [USFWS] is correct that the Federal Power Act gives it the authority to prescribe fishways as a condition of a FERC license, that authority does not exist in this proceeding with respect to anadromous salmonids because a structure downriver of the licensed project—admittedly outside of FERC jurisdiction [the C-H Dam]—presents an absolute obstacle to fish migration.

28.

Since [USFWS] cannot prescribe a fishway in connection with this relicensing proceeding, it lacks jurisdiction to initiate a study plan dispute." MID asserted that NMFS lacked jurisdiction for the same reasons.

In November 2009, in the midst of MID's dispute with the federal agencies, MID received a letter from the California Department of Fish and Game, i.e., CDFW (see fn. 4, *ante*). (MID RJN, Ex. Q; WAC RJN, McKinnon Dec. [9/19/22], Ex. A) This letter features prominently in the current arguments of both defendant and plaintiff. The letter states, in relevant part:

> "The [CDFW] has reviewed our previous direction regarding the fish ladder at Merced Irrigation District's [MID] Crocker-Huffman Diversion Dam, in the context of current condition of the anadromous fish populations in the Merced River, historic and ongoing efforts to manage those populations, and Fish and Game Code (FGC) § 5901, which provides that 'it is unlawful to construct or maintain' any barrier 'that prevents, impedes, or tends to prevent or impede, the passing of fish up and down stream,' unless otherwise authorized by the FGC.

> "[CDFW and MID] have made several adaptive changes at the Crocker-Huffman Diversion Dam over the years to reduce the impact the diversion and dam have on fish resources. At one time, [MID] operated a fishway at Crocker-Huffman. Then, in the early 1970s, [CDFW] recommended closing the fish ladder in conjunction with construction of an experimental spawning channel adjacent to the diversion dam. At that time, [CDFW] believed a spawning channel, along with minimum flow releases required by [FERC] from upstream hydropower projects (Nos. 2467 and 2179), would provide the best opportunity for restoring salmon on the Merced River. Unfortunately the spawning channel experiment failed and [MID] may no longer rely on [CDFW's] letter from the 1970s. Additional management actions are necessary to maintain and recover anadromous fish in the Merced River.

> "Today, the [C-H Dam] impedes the passage of resident and anadromous fish up and down stream except during rare high flow events. Meanwhile, the fall-run Chinook salmon (Oncorhynchus tshawytscha) and steelhead rainbow trout (O. mykiss) anadromous fish populations in the Merced River have deteriorated to extremely low levels. Given this background and the current situation, [CDFW] has determined that fish passage at the [C-H Dam] must be restored. FGC §5935 states 'the owner

29.

of any dam upon which a fishway has been provided shall keep the fishway in repair and open and free from obstructions to the passage of fish at all times'.  The [CDFW] directs [MID] to consult with [CDFW] to i) make a determination regarding anadromous fish passage adequacy of the existing (but closed) [C-H Dam] fishway and ii) assist [MID] in developing a Crocker-Huffman anadromous fish passage plan."

In a footnote, CDFW wrote, "This plan would include, but not be limited to, identifying the timeframes for fish passage implementation, restoration of anadromous fish habitat upstream of Crocker-Huffman in conjunction with passing fish upstream of Crocker-Huffman, and development of provisions to preclude further impacts to the Merced River anadromous fish populations as a result of operation of a fishway at Crocker-Huffman Dam."  The letter concluded by saying CDFW did not "expect nor desire that opening the existing fishway take place in an immediate and unplanned manner, but rather in a thoughtful and collaborative manner that leads to improved fish habitat and fish populations, as well as fitting with [MID's] operational needs to the greatest extent possible."

In December 2009, FERC sent a letter to Merced Irrigation District.  (WAC RJN, McKinnon Dec. [3/3/23], Ex. S)  In relevant part, the letter stated FERC's position that the C-H Dam "is maintained by MID for the implementation of its irrigation program, is not a licensed project facility, and therefore, is not within [FERC's] jurisdiction."

In November 2010, the National Marine Fisheries Service sent a letter to both Merced Irrigation District and PG&E.  (MID RJN, Ex. R)  In this letter, NMFS opined "that fish passage at Crocker-Huffman Dam and Merced Falls Dam should be re-established as a near-term, interim measure toward habitat restoration and recovery of Merced River's anadromous fish populations."  Accordingly, NMFS requested "hydraulic start-up testing [of the fish ladders at both locations] beginning in January or February, 2011."  NMFS also "recommend[s] hydraulic evaluation and testing of the now-defunct 'spawning channel' as an alternate means of fish passage at the Crocker-Huffman site."

30.

In April 2011, Merced Irrigation District sent a letter to the National Marine Fisheries Service regarding the C-H Dam fish ladder. (MID RJN, Ex. M) The letter informed NMFS of MID's view that reopening the fish ladder, even for testing, would be "premature" since "little would be gained by establishing fish passage at [the C-H Dam]." MID cited the 2007 Vogel study as justification for declining to perform the requested testing.

In January 2012, NMFS sent another letter to Merced Irrigation District and PG&E. (MID RJN, Ex. S) The letter states that NMFS's request for fish ladder testing was based on "detailed, on-site assessments of the fish ladders" performed by NMFS "fish passage engineers and biologists" in late 2010. Based on those inspections, NMFS "determined the fish ladders could function hydraulically if water were once again allowed to flow through them." The letter further states, "Unfortunately, both MID and PG&E declined to comply with NMFS' request to start up their respective fish ladders. Therefore, NMFS is investigating whether unauthorized 'take' of threatened Central Valley (CV) steelhead [within the meaning of the federal Endangered Species Act] is occurring on an annual or seasonal basis downstream of the Crocker-Huffman Dam on the Merced River." In concluding statements, NMFS "again urge[d] MID and PG&E to take immediate steps toward reinstating fish passage operations at Crocker-Huffman and Merced Falls dams" and "invite[d]" them "to plan and implement hydraulic start-up testing activities beginning in January or February of 2012." Both dam owners declined the invitation.

In January 2014, NMFS sent a letter to FERC enclosing a report from an NMFS-funded "Merced River Fish Passage Feasibility Study" conducted the previous year. (MID RJN, Ex. G) The letter states that "despite NMFS repeated efforts to obtain information about potential anadromous fish habitat, or to further study the inactive fish ladders, neither [FERC] nor [Merced Irrigation District or PG&E] adopted NMFS' requests for anadromous fish-related information, activation of the fish ladders, or study

31.

in areas upstream of New Exchequer Dam." Like the 2007 Vogel study, the NMFS-funded study appears to have been conducted by nongovernmental third parties. Unlike the Vogel study, the "Merced River Fish Passage Feasibility Study" reached the following notable conclusions:

"Reinstating the existing fish ladder [at the C-H Dam] would be the least costly and least time intensive approach to providing some [fish] passage over the dam.… Although the ladder is expected to perform below modern standards, the fish ladder could improve fish passage over the dam at certain flows. Reinstating the ladder is not considered a long term solution but it is a feasible alternative for providing some improvements to upstream and downstream migration passage."

"The habitat above Crocker-Huffman provides habitat for salmonids, including spawning habitat. Fish have used it in the past, and will use it in the future if passage is provided. The highest value below New Exchequer is in the reach immediately above Crocker-Huffman. Passage into this reach should be provided as soon as possible. [¶] … [¶] The existing fish ladder will at least provide an immediate route for passage…. We recommend that the ladder be utilized either as is or with modifications. However, a long-term solution should be put into place by utilizing the former spawning channel or constructing a new ladder and associated facilities."

In December 2015, FERC issued a "Final Environmental Impact Statement" (FEIS) for the Merced River Project and Merced Falls project.[8] (MID RJN, Ex. A) Defendant cites this document as evidence that "fish passage at C-H Dam" was considered "as part of the relicensing process … due largely to the [California State Water Resources Control Board's] inclusion of passage planning in its preliminary water quality certification for the relicensing. [Record citation.] While FERC staff did not recommend specific measures to require fish passage at C-H Dam, FERC recognized that

---

[8]In defendant's responsive brief, MID alleges FERC is currently "preparing a supplemental environmental impact statement, and on April 26, 2022, NMFS requested it include further evaluations of anadromous fish species and habitat in the Merced River up to C-H Dam." (Citing MID RJN, Ex. J)

32.

any conditions in a water quality certification issued by the SWRCB would be mandatory conditions in the license."

As reflected in the 2015 FEIS, the State Water Resources Control Board submitted a preliminary licensing condition with two alternatives: "Develop… a fish passage *or* habitat restoration plan that would result in [(1)] fish passage over Crocker-Huffman, McSwain, and New Exchequer dams *or* [(2)] decreasing water temperature in and downstream of the project." (Italics added.) However, when the SWRCB submitted its final water quality certification in 2020, it removed the fish passage requirement. ("Exhibit J" to MID's original RJN)

Defendant's briefing glosses over the absence of any conditions regarding the fish ladder in the final water quality certification. Without citing the actual document, MID writes, "In 2020, the SWRCB issued a final water quality certification that reserved its authority concerning anadromous fish reintroduction." The statement presumably refers to the following language in the document:

> "The State Water Board reserves the authority to modify or add conditions to this certification if State Water Board staff determine that it is reasonably foreseeable that state or federally listed anadromous fish species will be reintroduced into Projects-affected streams to ensure adequate protection of SR/SJR Basin Plan objectives and beneficial uses. For this condition, 'reasonably foreseeable' includes, but is not limited to, a comprehensive reintroduction effort or plan that has a reasonable likelihood of implementation within the following 18 months. [¶] The State Water Board also reserves the authority to require the Licensee to develop and conduct studies if it is reasonably foreseeable that listed anadromous fish species will be reintroduced into Projects-affected areas."

Plaintiff eventually learned about the controversy over the fish ladder. In a letter to Merced Irrigation District dated August 29, 2022, plaintiff alleged that for "over a decade, [MID] has failed to respond to requests by state and federal regulators to repair and reopen" the C-H Dam fish ladder. (WAC RJN, McKinnon Dec. [1/10/23], Ex. G) In a letter from defendant to plaintiff dated September 8, 2022, defendant stated it was "not

33.

able to respond to the claims and arguments … pending further action by FERC.  We instead expect FERC, and other agencies with jurisdiction, will address the issues you raise, including issues related to 'fishways' … and MID's duties under the Fish and Game Code and other provisions of State and Federal Law…."  (WAC RJN, McKinnon Dec. [1/10/23], Ex. H)

A few months after the lawsuit was filed, the California Department of Fish and Wildlife contacted defendant about the fish ladder.  In a letter dated December 8, 2022, CDFW wrote that it was "aware of the verified complaint and petition (complaint) Water Audit California (WAC) has filed against Merced Irrigation District (MID)."  (WAC RJN, McKinnon Dec. [1/10/23], Ex. J)  The second paragraph of the letter reads as follows:

> "CDFW agrees that fish passage needs to be restored at the dam.  Indeed, in a letter to MID dated November 16, 2009, [i.e., 13 years earlier,] CDFW explained that fish passage at Crocker-Huffman 'must be restored.'  To that end, CDFW directed MID to consult with CDFW to determine the adequacy of the existing fishway at the dam to pass fish and to develop a fish passage plan.  To CDFW's knowledge, MID did not respond to the letter and, as you know, the fishway remains closed.  CDFW is willing to meet with MID, presumably with NMFS, to offer technical assistance to accomplish these goals with the understanding that restoring fish passage at the dam, whether by using the existing fishway or by some other means, remains MID's responsibility."  (Fn. omitted.)

Two weeks later, in a letter dated December 20, 2022, defendant responded to CDFW.  (MID RJN, Ex. N)  The letter contains the following statements:

> "[T]here have been various discussions over time regarding fish passage at [the C-H] Dam; the CDFW fish hatchery; and other related items and issues.  These discussions have occurred in various forums, including as part of the larger relicensing process.  On a larger scale, MID is involved in ongoing discussions with regulatory agencies, including CDFW and NMFS, in numerous forums regarding the management and improvement of fish species and habitat on the Merced River ….  The discussions are part of the ongoing FERC relicensing proceedings that began in 2008 for the Merced River and Merced Falls hydroelectric projects, the related

34.

Endangered Species Act consultations with NMFS, [and] the related Clean Water Act Section 401 water quality certification proceedings in front of the State Water Resources Control Board (SWRCB) ...."

Defendant's comments in its December 2022 letter to CDFW were evidently brought to the attention of NMFS. A letter dated January 5, 2023, sent by NMFS to defendant, contains the following statements:

"... NMFS would appreciate specific information on these opportunities to collaborate, as we are not aware of Crocker-Huffman Dam ladder operations being part of discussions in the referenced arenas. We also note that FERC has stated Crocker-Huffman Dam is not part of the Project that is the subject of the referenced FERC licensing proceedings. [Citation.] MID itself has also stated that FERC has no jurisdiction over the Crocker-Huffman Dam in those proceedings. [Citations.]

"NMFS continues to support expeditious reopening of the fish ladder at Crocker-Huffman Dam to reestablish upstream and downstream fish passage, as well as initiating discussions between MID, NMFS, and CDFW, focused on further study to evaluate improvements to fish passage at this facility. NMFS supports CDFW's recent proposal to engage in technical assistance discussions with MID and is ready to participate in such discussions." (WAC RJN, McKinnon Dec. [1/10/23], Ex. L)

The California Department of Fish and Wildfire communicated with defendant again in a letter dated January 27, 2023. (WAC RJN, McKinnon Dec. [3/3/23], Ex. N) The letter contains the following statements:

"By letter dated December 8, 2022, the California Department of Fish and Wildlife (CDFW) informed the Merced Irrigation District (MID) that fish passage needs to be restored at the Crocker-Huffman Dam and offered to meet with MID to offer technical assistance to accomplish this goal. MID declined CDFW's offer. Instead, in response to CDFW's letter, you explained that MID would stay involved in 'ongoing proceedings and forums that consider a broad array of interrelated and important issues on the Merced River and downstream[,]' including 'the ongoing [Federal Energy Regulatory Commission's (FERC)] relicensing proceedings that began in 2008 for the Merced River and Merced Falls hydroelectric projects'.

"CDFW agrees there are many issues affecting fish species and habitat on the Merced River that are interrelated. However, this does not

35.

mean that each of these issues need to, will, or can be addressed at the same time or in one proceeding or forum. As the National Marine Fisheries Service (NMFS) explained in its January 5, 2023 letter to MID on this same topic, Crocker-Huffman Dam is not part of the FERC licensing proceedings for the two projects mentioned above.… In short, CDFW is not aware of any discussions regarding fish passage at the dam in any ongoing proceeding or forum, but even if that were the case, it would not preclude MID from obtaining technical assistance and developing a fish passage plan, nor would these other processes excuse MID from its present and ongoing legal obligation to provide fish passage. (See Fish & G. Code, §§ 5901, 12025.1, subd. (a).)" (Fns. omitted.)

In June 2023, shortly after plaintiff filed its second amended complaint/petition, defendant sent a letter to NMFS. (MID RJN, Ex. O) In this letter, MID summarized "major points of [a] meeting" the previous month between MID, NMFS, and CDFW. MID referred to a tentative agreement for it to conduct testing of the C-H Dam fish ladder under certain conditions dictated by MID. Elsewhere in the letter, MID stated its disagreement with NMFS on various issues including MID's position on the potential downsides of reopening the fish ladder. For example: "[MID does] not agree that 'there [are] no risks or major impacts to flows and infrastructure as a result of opening the fish ladder other than the potential cost of screening the MID's main diversion canal.' [MID has] pointed out that if fish passed upstream and the Main Canal intake was screened, fish could be injured as they pass over the Crocker-Huffman Diversion Dam spillway and [MID] could be held liable for such injury." (Italics omitted.)

In late September 2023, while defendant's penultimate demurrer was pending, NMFS sent a letter to FERC. (MID RJN, Ex. P) It contains these statements:

"This letter is in regard to the recent opening of MID's fish ladder at Crocker-Huffman Dam for the purposes of hydraulic testing.… [¶] … On September 19, 2023, while the fish ladder was open, NMFS, filed a letter [citation] with MID restating the request that MID leave the Crocker-Huffman's Dam's Fish Ladder open after hydraulic testing of the ladder. … However, as noted in a summary e-mail of the hydraulic testing activity [citation], MID reclosed the fish ladder."

## C. Applicable Law re: Traditional Mandamus

Superior courts have mandamus jurisdiction under article VI, section 10, of the California Constitution. "Mandamus" and "mandate" are interchangeable terms referring to a type of extraordinary relief granted by the issuance of a writ. (See Code Civ. Proc., § 1084; *Henneberque v. City of Culver City* (1985) 172 Cal.App.3d 837, 840, 844.) Two forms of mandamus are available to challenge government actions: traditional and administrative. (Code Civ. Proc., §§ 1085, 1094.5; *Malott v. Summerland Sanitary Dist.* (2020) 55 Cal.App.5th 1102, 1109.) The operative pleading cites to Code of Civil Procedure section 1085, thus indicating a cause of action for traditional mandamus.

"A writ of mandate under Code of Civil Procedure section 1085 is a legal tool to compel a public agency to perform a legal, typically ministerial, duty." (*California Privacy Protection Agency v. Superior Court* (2024) 99 Cal.App.5th 705, 721, fn. omitted; see *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 442 ["Mandamus, rather than mandatory injunction, is the traditional remedy for the failure of a public official to perform a legal duty"].) "The writ will issue against a county, city, or other public body, or against a public officer." (*Ochoa v. Anaheim City School Dist.* (2017) 11 Cal.App.5th 209, 223.)

A cause of action for traditional mandamus has two essential elements: "'(1) A clear, present and usually ministerial duty on the part of the respondent … ; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty ….'" (*Santa Clara County Counsel Attys. Assn. v. Woodside* (1994) 7 Cal.4th 525, 539–540.) These elements imply a third requirement, which is the respondent's ability to perform the duty. (See *Siskiyou Hospital, Inc. v. County of Siskiyou* (2025) 109 Cal.App.5th 14, 41 ["a traditional writ of mandate will only lie where there is a ministerial duty capable of direct enforcement"]; *Collins v. Thurmond* (2019) 41 Cal.App.5th 879, 915.) In addition, the petitioner must ordinarily show "'there is not a plain, speedy, and adequate remedy,

37.

in the ordinary course of law.'" (*Flores v. Department of Corrections & Rehabilitation* (2014) 224 Cal.App.4th 199, 205, quoting Code Civ. Proc., § 1086.)

"A respondent may test the legal sufficiency of a petition for writ of mandate by demurrer." (*Committee for Sound Water & Land Development v. City of Seaside* (2022) 79 Cal.App.5th 389, 399.) The rules governing demurrers to civil complaints also apply to mandamus actions. (*Pinto Lake MHP LLC v. County of Santa Cruz* (2020) 56 Cal.App.5th 1006, 1012, citing Code Civ. Proc., § 1109.) On appeal, the reviewing court independently determines whether the petition states a viable claim. (*Santa Paula Animal Rescue Center*, *Inc. v. County of Los Angeles* (2023) 95 Cal.App.5th 630, 638; accord, *City of Seaside*, at p. 399 ["On appeal from an order of dismissal after a demurrer is sustained without leave to amend, our review is de novo"].)

### D. Standing

Plaintiff's lack of standing to sue for public nuisance does not necessarily preclude mandamus relief. "As a general rule, a party must be 'beneficially interested' to seek a writ of mandate." (*Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 165, quoting Code Civ. Proc., § 1086.) A beneficial interest is "'some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.'" (*Save the Plastic Bag Coalition*, at p. 165.) The concept of "'public interest standing'" is an exception to the general rule. (*Id*. at p. 166; see *Reynolds v. City of Calistoga* (2014) 223 Cal.App.4th 865, 874 [noting the "public interest standing exception has been consistently applied only in the context of mandamus proceedings"].)

"'"[W]here the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the [petitioner] need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced."'" [Citation.] This

"'public right/public duty" exception to the requirement of beneficial interest for a writ of mandate' 'promotes the policy of guaranteeing citizens the opportunity to ensure that no governmental body impairs or defeats the purpose of legislation establishing a public right.'" (*Save the Plastic Bag Coalition v. City of Manhattan Beach*, *supra*, 52 Cal.4th at p. 166.)

The public interest exception is discretionary and may be rejected where "'the policy underlying the exception [is] outweighed … by competing considerations of a more urgent nature,'" or the lawsuit "'is driven by personal objectives rather than "broader public concerns."'" (*People for Ethical Operation of Prosecutors etc. v. Spitzer* (2020) 53 Cal.App.5th 391, 408.) The trial court never questioned plaintiff's standing, and defendant challenges standing only with respect to the public nuisance claim. Although corporations are technically not citizens, the public right/public duty exception is generally available to legal entities "[a]bsent compelling policy reasons" to disallow it. (*Save the Plastic Bag Coalition v. City of Manhattan Beach*, *supra*, 52 Cal.4th at p. 168.) As the issue appears uncontested and the record is supportive of the basic requirements, we conclude public interest standing was adequately pleaded.

### E. Mandatory Duties

#### 1. Relevant Law

"Mandamus will lie to compel a public official to perform an official act required by law. [Citation.] Mandamus will not lie to control an exercise of discretion, i.e., to compel an official to exercise discretion in a particular manner. Mandamus may issue, however, to compel an official both to exercise his discretion (if he is required by law to do so) and to exercise it under a proper interpretation of the applicable law." (*Common Cause v. Board of Supervisors*, *supra*, 49 Cal.3d at p. 442.)

Discretion is "the power conferred on public functionaries to act officially according to the dictates of their own judgment." (*Rodriguez v. Solis* (1991) 1

Cal.App.4th 495, 502.) "Where a statute or ordinance clearly defines the specific duties or course of conduct that a governing body must take, that course of conduct becomes mandatory and eliminates any element of discretion." (*Id*. at pp. 504–505.) In this context, "mandatory" and "ministerial" duties are generally synonymous.

To restate the basic requirement, a petitioner "must establish the existence of a public officer's or a public entity's '"clear, present, and ministerial duty"'" to act or refrain from acting in a certain way. (*Herron v. San Diego Unified Port Dist.* (2025) 109 Cal.App.5th 1, 10.) "A ministerial duty is an act that a public agency or officer is required to perform in a prescribed manner in obedience to the mandate of legal authority without regard to any personal judgment concerning the propriety of the act." (*Siskiyou Hospital, Inc. v. County of Siskiyou*, *supra*, 109 Cal.App.5th at p. 41; accord, *Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916.) Generally speaking, "[a] ministerial duty is one which is required by statute." (*County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, 653; see *County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 639 ["An enactment creates a mandatory duty if it requires a public agency to take a particular action"].)

"A trial court must determine whether the agency had a ministerial duty capable of direct enforcement or a quasi-legislative duty entitled to a considerable degree of deference." (*County of Los Angeles v. City of Los Angeles*, *supra*, 214 Cal.App.4th at p. 653.) If the issue requires statutory interpretation, it is reviewed de novo. (*Ibid*.; *Crestwood Behavioral Health, Inc. v. Baass* (2023) 91 Cal.App.5th 1, 15.) "In order to construe a statute as imposing a mandatory duty, the mandatory nature of the duty must be phrased in explicit and forceful language." (*Quackenbush v. Superior Court* (1997) 57 Cal.App.4th 660, 663.) If the agency's performance is "'unqualifiedly required, it is not discretionary, even though the manner of its performance may be discretionary.'" (*Redwood Coast Watersheds Alliance v. State Bd. of Forestry & Fire Protection* (1999) 70 Cal.App.4th 962, 970.)

### *2. Analysis*

Fish and Game Code section 5900 et seq. is a statutory scheme governing "the damming of rivers and streams which are naturally frequented by fish." (*State of California v. San Luis Obispo Sportsman's Assn.* (1978) 22 Cal.3d 440, 448.) Numerous provisions impose "affirmative duties on dam owners to take steps to preserve and protect the fish population. (See, e.g., Fish & G. Code, §§ 5931, 5933, 5938, 5942.) They derive from the long-settled principle that the fish within the waters of the state are owned by the state in trust for the people and from the state's authority to regulate to protect and preserve this valuable public resource." (*San Luis Obispo Sportsman's Assn.*, at pp. 448–449.)

Fish and Game Code section 5901 broadly prohibits constructing or maintaining "any device or contrivance that prevents, impedes, or tends to prevent or impede, the passing of fish up and down stream." Violations are punishable, inter alia, by a fine of up to $8,000. (*Id.*, § 12025.1, subd. (a).) "Each day that a violation of Section 5901 occurs or continues without a good faith effort by the person to cure the violation after receiving notice from the [CDFW] shall constitute a separate violation."[9] (*Ibid.*)

Fish and Game Code section 5935, upon which plaintiff also (and primarily) relies, consists of one sentence: "The owner of any dam upon which a fishway has been provided shall keep the fishway in repair and open and free from obstructions to the passage of fish at all times." The next provision in the statutory scheme declares, "It is unlawful to wilfully [*sic*] destroy, injure, or obstruct any fishway." (Fish & G. Code, § 5936.) We will focus on section 5935.

---

[9]The full text of Fish and Game Code section 5901 reads: "Except as otherwise provided in this code, it is unlawful to construct or maintain in any stream in Districts 1, 1⅜, 1½, 2, 2¼, 2½, 3, 3½, 4, 4⅛, 4½, 4¾, 11, 12, 13, 23, and 25, any device or contrivance that prevents, impedes, or tends to prevent or impede, the passing of fish up and down stream." By express reference to Districts 1 and 3, the statute applies to all parts of Merced County. (See Fish & G. Code, §§ 41, 11001, 11008.)

"Under the plain meaning rule, when the language of a statute is clear, we need go no further. [Citation.] In that case, 'no court need, or should, go beyond that pure expression of legislative intent. [Citation.]'" (*Switzer v. Wood* (2019) 35 Cal.App.5th 116, 128, quoting *Green v. State of California* (2007) 42 Cal.4th 254, 260.) "'If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs.'" (*Young v. Fish & Game Com.* (2018) 24 Cal.App.5th 1178, 1193.)

The common and legal definitions of "duty" speak of obligations generally arising from the obligor's position or status. (See *Amezcua v. Los Angeles County Civil Service Com.* (2019) 44 Cal.App.5th 391, 398; Black's Law Dict. (12th ed. 2024) p. 636.) Section 5935 places an obligation on "the owner of any dam upon which a fishway has been provided" to "keep the fishway in repair and open and free from obstructions to the passage of fish at all times." (Fish & G. Code, § 5935.) The statute plainly describes a duty applicable to certain dam owners.

Next, we consider whether the party with the duty is "required to perform it in a prescribed manner when a given state of facts exists." (*Hudson v. County of Los Angeles* (2014) 232 Cal.App.4th 392, 408; accord, *Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1082.) The answer is yes. If a dam is equipped with a fish ladder, the dam's owner must keep the fish ladder open and unobstructed. (Fish & G. Code, § 5935.)

Does the statute indicate the "'mandatory nature of the duty'" by phrasing it "'in explicit and forceful language'"? (*Collins v. Thurmond*, *supra*, 41 Cal.App.5th at p. 914.) Yes, it does. "The owner of any dam upon which a fishway has been provided *shall* keep the fishway in repair and open and free from obstructions to the passage of fish *at all times*." (Fish & G. Code, § 5935, italics added.)

As used throughout the Fish and Game Code, "'[s]hall' is mandatory and 'may' is permissive." (Fish & G. Code, § 79; see *id*., § 2.) "Use of the mandatory language

42.

'shall' indicates a legislative intent to impose a mandatory duty; no discretion is granted." (*In re Luis B.* (2006) 142 Cal.App.4th 1117, 1123; accord, *California Privacy Protection Agency v. Superior Court* (2024) 99 Cal.App.5th 705, 723, citing *In re Luis B.*, at p. 1123.)  Section 12000 of the same code further suggests the mandatory nature of the duty:  "Except as expressly provided otherwise in this code, any violation of this code, or of any rule, regulation, or order made or adopted under this code, is a misdemeanor." (Fish & G. Code, § 12000, subd. (a).)

By all indications, compliance with Fish and Game Code section 5935 is not discretionary for dam owners.  Put differently, the owner of a dam upon which a fishway has been provided cannot choose to keep the fishway open or closed "according to the dictates of their own judgment." (*Rodriguez v. Solis*, *supra*, 1 Cal.App.4th at p. 502 [defining discretion for purposes of traditional mandamus].)  The *prosecutorial* discretion of the California Department of Fish and Wildlife is an entirely separate issue, as is the possibility that noncompliance may be legally excused under a given set of facts.

In *Goddard v. Department of Fish & Wildlife* (2015) 243 Cal.App.4th 350, this district considered the language of Fish and Game Code section 5935 in resolving an issue regarding CDFW's alleged civil liability for the condition of an out-of-service dam it did not own.  The allegedly dangerous condition "was caused by [a] fish ladder washing away after its installation." (*Goddard*, at p. 364.)  Relying on section 5935, CDFW argued the duty to maintain the fish ladder fell upon the dam's owner and not CDFW. (*Goddard*, at pp. 364–365.)

The *Goddard* opinion states, in relevant part:  "[CDFW] exists to enforce the Fish and Game Code [citation], not to exercise control over dams or their remnants. … At best, [CDFW] exercised a regulatory role with respect to the dam remnant.  But, as [CDFW] points out, that does not equate to control." (*Goddard v. Department of Fish & Wildlife*, *supra*, 243 Cal.App.4th at p. 366.)  In other words, CDFW does not itself perform the duty Fish and Game Code section 5935 imposes upon dam owners.

43.

Merced Irrigation District argues it has no current duty under Fish and Game Code section 5935 because its evidence shows CDFW ordered/authorized the closing of the C-H Dam fish ladder in 1970. Losing sight of the difference between a demurrer and a motion for summary judgment, MID further argues there is "no evidence of a direct order by CDFW or any other agency to MID to immediately open the fish ladder or otherwise restore fish passage at C-H Dam." MID also writes, "With the opening of the [Merced River Hatchery] in 1970, CDFW directed that the C-H Dam fish ladder be rendered inoperable so that CDFW could operate a spawning channel." These are all defensive factual allegations not found in the operative pleading.

Paragraph 29 of the operative pleading alleges, "The fishway at the Crocker-Huffman Dam has been closed since approximately 1972." The next paragraph alleges, "CDFW operates the Merced River Hatchery ('MRH') downstream of the Crocker-Huffman Dam." There are no further contentions regarding the initial closing of the fish ladder, and the relevance of the Merced River Hatchery is never explained.

Assuming the truth of defendant's factual allegations would not change the mandatory nature of Fish and Game Code section 5935. Defendant's arguments concern the possible existence of affirmative defenses, i.e., legal excuses for not complying with the statute. The arguments raise mixed questions of law and fact that cannot be determined at this juncture. For example, CDFW sent three letters to MID between 2009 and 2023 arguably indicating that any prior justification for keeping the fish ladder closed was no longer viewed as such by CDFW. The 2009 letter states, "[MID] may no longer rely on [CDFW's] letter from the 1970s.… [¶] … [CDFW] has determined that fish passage at the Crocker-Huffman Diversion Dam must be restored. [Fish and Game Code section] 5935 states 'the owner of any dam upon which a fishway has been provided shall keep the fishway in repair and open and free from obstructions to the passage of fish at all times'."

44.

In the 2023 letter, CDFW cited Fish and Game Code section 5901, and the corresponding penalty provision (*id*., § 12025.1), in support of the following statement:

> "CDFW is not aware of any discussions regarding fish passage at the dam in any ongoing proceeding or forum, but even if that were the case, it would not preclude MID from obtaining technical assistance and developing a fish passage plan, *nor would these other processes excuse MID from its present and ongoing legal obligation* to provide fish passage."  (Italics added.)

MID argues CDFW "would not have allowed the fish ladder to remain closed since 1970" if the duty to keep fish ladders open were mandatory.  The argument ignores, inter alia, the concept of prosecutorial discretion.  (See *Heckler v. Chaney* (1985) 470 U.S. 821, 831 ["[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion"].)  "[P]ast nonenforcement does not necessarily reflect a formal administrative interpretation *precluding* enforcement, but could instead reflect the exercise of prosecutorial discretion or limited resources …."  (*Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 443.)  More to the point, CDFW's "previous lack of enforcement does not rewrite the statute."  (*Ibid*.)

In a last-ditch effort, MID selectively quotes from other provisions within the statutory scheme.  Those statutes will be discussed in numerical order.  We discuss them only briefly, however, because (1) MID's arguments again relate to potential defenses not yet factually established and (2) MID acknowledges that the only discretion reflected in the statutes lies with the California Department of Fish and Wildlife and/or the California Fish and Game Commission.

Fish and Game Code section 5931 provides:

> "If, in the opinion of the [Fish and Game Commission], there is not free passage for fish over or around any dam, the [CDFW] shall cause plans to be furnished for a suitable fishway, and order in writing the owner of the dam to provide the dam, within a specified time, with a durable and efficient fishway, of such form and capacity and in such location as shall be

determined by [CDFW]. Such fishway shall be completed by the owner of the dam to the satisfaction of the [CDFW] within the time specified."

Defendant contends the quoted language shows "that fish passage obligations are [not] automatic, ministerial and absolute, … [nor] solely the obligation and responsibility" of dam owners. This carefully worded argument seems intended to distract or mislead. Plaintiff does not allege all statutes concerning fish passage are "automatic" and "absolute," i.e., not subject to exceptions and contingencies, or that all "fish passage obligations" in the statutory scheme fall upon dam owners. Plaintiff's cause of action is specific to the duties of those who own dams "upon which a fishway has been provided." (Fish & G. Code. § 5935.)

A fishway enables "free passage for fish" within the meaning of Fish and Game Code section 5931. (*California Trout*, *Inc. v. State Water Resources Control Bd.* (1989) 207 Cal.App.3d 585, 606.) The C-H Dam is already equipped with a fishway, and it is possible the Fish and Game Commission would conclude the existing fishway provides free passage for fish when open and unobstructed. Nothing in the language of Fish and Game Code section 5931 indicates that *section 5935* is discretionary, i.e., that the owner of a dam upon which a fishway has been provided has discretion to close or otherwise obstruct the fishway.

Also, as noted in CDFW's amicus curiae brief, Fish and Game Code section 5931 concerns actions to be taken by CDFW if the Fish and Game Commission makes certain findings. "Here, there is no evidence that the Commission made any findings, or that the Commission or [CDFW] issued any orders." Nor do the pleadings contain any allegations of such findings or orders.

Defendant also cites Fish and Game Code section 5933. This statute is applicable "[w]henever an application for approval of plans and specifications for a new dam …, or for the enlargement of [an existing] dam …, is filed with the Department of Water Resources." If a dam is proposed to be built or enlarged, the Fish and Game Commission

46.

determines whether "the construction of a fishway over such a dam is necessary for the preservation and protection of fish …." (*Ibid*.)  Defendant quotes from the statute without explaining how it is even potentially relevant to the interpretation of section 5935 or this case in general.

Next is Fish and Game Code section 5938, which "authorizes the development of a fish hatchery in lieu of the *construction* of a fishway over or around a dam, if that proves impracticable."  (*California Trout*, *Inc. v. State Water Resources Control Bd*., *supra*, 207 Cal.App.3d at p. 606, italics added.)  Defendant argues that is "exactly what occurred with the fishway at C-H Dam" in 1970, ignoring that its own evidence shows the fishway was in existence (i.e., had already been constructed) before the Merced River Hatchery was built.  We need not interpret section 5938, however, because defendant is merely alleging a legal justification for initially closing the fish ladder.  The occurrence of subsequent unexcused and continuing violations of section 5935 is a disputed issue involving mixed questions of fact and law.  "[A] court ruling on a demurrer cannot decide a question that may depend on disputed facts by means of judicial notice." (*Fremont Indemnity Co. v. Fremont General Corp*. (2007) 148 Cal.App.4th 97, 115.)

Lastly, defendant notes "Fish and Game Code Section 5942 also states that the Fish and Game Commission may 'in lieu of a fishway, … order the owner of the dam to plant, under the supervision of [CDFW], the young of such fish as naturally frequent the waters of the stream or river, at such times, in such places, and in such numbers as the [Fish and Game Commission] may order."  The quote is accurate, but the statute is unhelpful without any allegations or evidence of the Fish and Game Commission ever issuing such orders with regard to the C-H Dam.  Moreover, as with all other provisions discussed, the statute does not confer any discretion upon dam owners.

In summary, mandamus is available "to challenge an agency's failure to perform an act required by law." (*Danser v. Public Employees' Retirement System* (2015) 240 Cal.App.4th 885, 890; accord, *Common Cause v. Board of Supervisors*, *supra*, 49 Cal.3d

47.

at p. 442.) Control over discretionary aspects of the required performance will not be mandated, but petitioners may seek "to compel *some action* upon the subject involved under a proper interpretation of the applicable law." (*Morris v. Harper* (2001) 94 Cal.App.4th 52, 63, italics added; see *Johnson v. State of California* (1968) 69 Cal.2d 782, 788 ["'[I]t would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail'"].) Plaintiff has emphasized it seeks only to compel statutory compliance and not the manner in which the duty is performed.

None of defendant's arguments refute the mandatory nature of the duty imposed upon dam owners to keep existing fishways "in repair and open and free from obstructions." (Fish & G. Code, § 5935.) As such, we conclude plaintiff has alleged the required existence of a duty. Whether defendant's performance of the duty is impossible, impracticable, or otherwise legally excused are fact-based affirmative defenses that have yet to be established. (See *TracFone Wireless*, *Inc. v. County of Los Angeles* (2008) 163 Cal.App.4th 1359, 1368 ["Questions of fact may be resolved on demurrer only when there is only one legitimate inference to be drawn from the allegations of the complaint"].)

### F. Statutes of Limitations

"'The statute of limitations applicable to a writ of mandamus under Code of Civil Procedure section 1085 depends upon the nature of the obligation sought to be enforced. [Citation.]' [Citation.] 'It is often difficult to decide which statute of limitations governs an action for writ of mandate. The code provisions authorizing this action are silent as to the time within which it must be filed. [Citation.] Accordingly, the courts have developed the rule that the question is to be resolved not by the remedy prayed for but by the nature of the underlying right or obligation that the action seeks to enforce." (*Branciforte Heights*, *LLC v. City of Santa Cruz* (2006) 138 Cal.App.4th 914, 926.)

"In order for the bar of the statute of limitations to be raised by demurrer, the defect must clearly and affirmatively appear on the face of the complaint." (*McMahon v. Republic Van & Storage Co., Inc.* (1963) 59 Cal.2d 871, 874.) "Questions concerning whether an action is barred by the applicable statute of limitations are typically questions of fact." (*Sahadi v. Scheaffer* (2007) 155 Cal.App.4th 704, 713.) The issue is determinable as a matter of law only if all relevant facts are undisputed. (*Ibid*.) Therefore, ""[a] demurrer based on a statute of limitations will not lie where the action may be, but is not necessarily, barred.… [I]t is not enough that the complaint shows that the action may be barred."" (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42.)

The trial court's stated ground for dismissing the mandamus claim was plaintiff's failure to plead "a specific action by a specific agency occurring on a specific date that is not time barred." Defendant argues the ruling is correctly based on an implied determination that plaintiff is challenging "*CDFW's* closure of the fish ladder in 1970, and such claims [are] therefore barred by the applicable statutes of limitation." (Italics added.) In making this argument, defendant ignores the pleaded contentions.

Paragraph 72 of the operative pleading states, "The injury being addressed by this litigation is not that the fishway was closed fifty years ago, but that Merced [Irrigation District] continues to block the fishway today." Paragraph 78 explains plaintiff is challenging defendant's "*continuing* refusal to provide passage for fish in breach of its *present* statutory duties …." (Italics added.) Paragraph 91 cites *California Trout, Inc. v. State Water Resources Control Bd.*, *supra*, 207 Cal.App.3d 585 for the proposition that ongoing breaches of public duties may be viewed as """continuing" and hence "abatable," despite the fact that the acts or omissions have been conducted for a period beyond that of the pertinent statute of limitations.'"

Defendant contends the limitations period is either 90 days or three or four years. The first contention is based on unexplained citations to Code of Civil Procedure sections

1094.5 and 1094.6. By necessary implication, defendant insinuates the fish ladder was closed pursuant to an adjudicatory decision resulting from formal administrative proceedings. (See *ibid*.) Nothing in the record suggests, nor do the pleadings allege, any such proceedings ever occurred.

The other contentions are based on Code of Civil Procedure sections 338 and 343. The former prescribes a three-year limitations period for actions "upon a liability created by statute, other than a penalty or forfeiture." (*Id*., § 338, subd. (a).) The latter is "a catchall provision that provides a statute of limitations in situations where no specific limitations period applies." (*Geneva Towers Ltd. Partnership v. City and County of San Francisco* (2003) 29 Cal.4th 769, 773.)

Plaintiff, and the California Department of Fish and Wildlife as amicus curiae, rely on *California Trout*, *Inc. v. State Water Resources Control Bd*., *supra*, 207 Cal.App.3d 585 (*California Trout*) to argue there is no statute of limitations to remedy an encroachment on the public trust interest in fish and fishery resources. (See *id*. at pp. 630–631.) We need not decide whether *California Trout* supports such a broad proposition. The "public trust" analysis was one of two alternative rationales upon which the *California Trout* court relied in resolving a statute of limitations issue. The other was a variation of the continuous accrual doctrine. (See *id*. at pp. 626–629.) Plaintiff and CDFW also rely on continuous accrual theories, and those arguments are well taken.

In *California Trout*, private organizations petitioned for writs of mandate to compel the recission of licenses issued by the State Water Resources Control Board to the City of Los Angeles and one of its departments. The licenses confirmed rights to appropriate water "by means of dams from four creeks in Mono County." (*California Trout*, *supra*, 207 Cal.App.3d at p. 592.) The petitioners alleged the licenses violated Fish and Game Code section 5946, which prohibits the SWRCB from issuing licenses or permits to appropriate water from parts of Mono and Inyo Counties unless such licenses or permits are conditioned upon compliance with Fish and Game Code section 5937.

50.

(*California Trout*, at p. 592; Fish & G. Code, § 5946, subd. (b).)  The latter provision states, in relevant part, "The owner of any dam shall allow sufficient water at all times to pass through a fishway, or in the absence of a fishway, allow sufficient water to pass over, around or through the dam, to keep in good condition any fish that may be planted or exist below the dam."  (Fish & G. Code, § 5937.)

The appeal in *California Trout* followed a trial court's dismissal of the writ petitions.  The appellate court reversed the judgments of dismissal.  One of several issues decided was a claim the petitions were time-barred under various statutes, including the outermost limitations period of four years under Code of Civil Procedure section 343. (*California Trout*, *supra*, 207 Cal.App.3d at p. 628.)

The *California Trout* respondents argued a position similar to the one taken by Merced Irrigation District in this case.  Much like MID's attempt to characterize the lawsuit as a challenge to the closing of the fish ladder in 1970, the *California Trout* respondents argued the petitioners were seeking judicial review of the "action granting issuance of the licenses" several years earlier.  (*California Trout*, *supra*, 207 Cal.App.3d at p. 626.)  However, "the petitions alleged facts showing a *continuing duty* of the [SWRCB] to apply [Fish and Game Code] section 5946 to the licenses," and the licenses were "subject to [SWRBC's] 'ongoing' power of revocation."  (*Ibid*.)  Therefore, the historical act of issuing the licenses was "open to a *present* correction to bring them into conformity with section 5946."  (*Ibid*.)  The appellate court rejected the argument that mandamus relief would necessarily "'call for the [SWRCB] to look backward and review its past decisions which have become final by the passage of time.'"  (*Id*. at p. 627.)

The purpose of Fish and Game Code section 5946, i.e., the statute at issue in *California Trout*, "is to obtain the release of sufficient water in the future to sustain fish in streams in [the subject region] from which water is appropriated."  (*California Trout*, *supra*, 207 Cal.App.3d at p. 628.)  Restated, "the purpose is to maintain fisheries in such streams on an ongoing basis.  Hence, the failure to affix to the licenses language

51.

conditioning future diversion upon such releases" was held to constitute "a continuing violation of the statute as to which no statute of limitations prevents remediation." (*Ibid.*) The mandamus action was thus described as being "of such a nature that it is outside the ambit of the generic statutes of limitation," i.e., Code of Civil Procedure sections 338 and 343. (*California Trout*, at p. 628.)

The relevant holding of *California Trout* was based in part on the "wholly prospective and ministerial" nature of the relief sought. (*California Trout*, *supra*, 207 Cal.App.3d at p. 627.) The appellate court analogized to a rule governing equitable actions for the abatement of a public nuisance. (*Id.* at p. 628; see *City of Norwalk v. City of Cerritos* (2024) 99 Cal.App.5th 977, 990 ["public nuisance liability has no statute of limitations because such nuisances are a continuing wrong"].) "If the nuisance is the sort of ongoing conduct that can be discontinued by an order to stop acts or omissions it is viewed as 'continuing' and hence 'abatable,' despite the fact that the acts or omissions have been conducted for a period beyond that of the pertinent statute of limitations. [Citations.] The same principle has been applied to other ongoing wrongs." (*California Trout*, at pp. 628–629.)

The "continuous accrual doctrine" is a designation that came into use after the California Supreme Court applied a "theory of continuous accrual" in *Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809. (*Id.* at p. 822; see *id.* at pp. 818–825; *Armstrong Petroleum Corp. v. Tri-Valley Oil & Gas Co.* (2004) 116 Cal.App.4th 1375, 1388 [referring to "what Justice Werdegar has termed a 'theory of continuous accrual'"].) The issue there was the point of accrual for "an action against a city for allegedly imposing and collecting a general tax on its residents without the voter approval mandated by [law]." (*City of LaHabra*, at p. 812.) It was unanimously held "that if, as alleged, the tax is illegal, its continued imposition and collection is an ongoing violation, upon which the limitations period begins anew with each collection." (*Ibid.*)

52.

Although *California Trout* predates the modern nomenclature, its holding rests on the same basic concept. "Generally speaking, continuous accrual applies whenever there is a continuing *or* recurring obligation: 'When an obligation or liability arises on a recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new limitations period.'" (*Aryeh v. Canon Business Solutions*, *Inc.*, *supra*, 55 Cal.4th at p. 1199, italics added.)

The continuous accrual doctrine "is a response to the inequities that would arise if the expiration of the limitations period following a first breach of duty or instance of misconduct were treated as sufficient to bar suit for any subsequent breach or misconduct; parties engaged in long-standing misfeasance would thereby obtain immunity in perpetuity from suit even for recent and ongoing misfeasance." (*Aryeh v. Canon Business Solutions*, *Inc.*, *supra*, 55 Cal.4th at p. 1198.) "In addition, where misfeasance is ongoing, a defendant's claim to repose, [i.e.,] the principal justification underlying the limitations defense, is vitiated." (*Ibid.*) "The effect of the doctrine is that 'a suit for relief may be partially time-barred as to older events but timely as to those [acts of wrongdoing occurring] within the applicable limitations period.'" (*Gilkyson v. Disney Enterprises*, *Inc.* (2016) 244 Cal.App.4th 1336, 1341; accord, *Orange County Water Dist. v. Sabic Innovative Plastics US*, *LLC*, *supra*, 14 Cal.App.5th at p. 395.)

The doctrine is typically applied in cases where periodic or recurring breaches of duty have caused financial injury. In *Aryeh*, for example, the defendant was accused of periodically inserting unjustified and/or fraudulent charges into monthly bills. (*Aryeh v. Canon Business Solutions*, *Inc.*, *supra*, 55 Cal.4th at pp. 1190, 1200.) To determine whether the continuous accrual doctrine applied, the California Supreme Court analyzed "the nature of the obligation allegedly breached." (*Id.* at p. 1200.) The alleged "duty not to impose unfair charges in monthly bills" was inherently "a continuing one, *susceptible* to recurring breaches. Accordingly, each alleged breach [was] treated as triggering a new statute of limitations." (*Ibid.*, italics added.)

Merced Irrigation District argues "there is no evidence of or indication that [it] is breaching 'a recurring obligation.'" The question is not whether a duty periodically arises, but whether a continuing duty is breached on a recurring or ongoing basis. The fact pattern here is atypical because the pleadings do not allege periodic reopening and reclosing of the C-H Dam fish ladder. However, plaintiff alleges ongoing violations of Fish and Game Code section 5901, which prohibits maintaining "any device or contrivance that prevents, impedes, or tends to prevent or impede, the passing of fish up and down stream." Plaintiff alleges MID's breach of the duty to keep the fish ladder open and unobstructed (Fish & G. Code, §§ 5935, 5936) is the manner in which MID continues to violate section 5901. Under the Fish and Game Code, ongoing violations of section 5901 are viewed as *recurring* violations. "Each day that a violation of Section 5901 occurs or continues without a good faith effort by the person to cure the violation after receiving notice from [CDFW] shall constitute a separate violation." (Fish & G. Code, § 12025.1, subd. (a).)

In any event, under *California Trout*, a writ of mandamus to compel performance of continuing duties under the fishway statutes may be sought regardless of whether statutes of limitations that would otherwise be applicable have already expired. (*California Trout*, *supra*, 207 Cal.App.3d at p. 628.) Defendant makes no real effort to distinguish *California Trout*. Instead, it repeats the same fact-based defense asserted throughout its briefs:

> "MID cannot be engaging in a continuing or ongoing violation of the purported statutes addressing fish passage where it is simply following the prior direction and orders of CDFW to close the fish ladder, and where CDFW and other agencies have not ordered MID to reopen the fish ladder or otherwise restore fish passage at C-H Dam."

We reject MID's argument that the availability of mandamus necessarily turns on "CDFW's initial closure of the fish ladder in 1970, and the lack of any subsequent order or direction to MID to immediately reopen the fish ladder or restore fish passage at C-H

54.

Dam." MID uses the word "immediately" in multiple instances to suggest it cannot be found in breach of the alleged fishway duties unless CDFW or some other agency demanded immediate statutory compliance. As we have explained, the alleged justification for closing the fish ladder 55 years ago is not dispositive because there are mixed questions of fact and law regarding if, and when, the alleged justification ceased to exist. Those issues are not resolvable at the pleading stage.

Furthermore, defendant's own evidence unequivocally indicates defendant reopened and reclosed the fish ladder in September 2023, before the operative pleading was filed. There are photographs allegedly depicting the reopened fish ladder. This evidence was judicially noticed and, without assuming the truth of its contents, would provide a basis for supplementing the operative pleading (see Code Civ. Proc., § 464) with allegations of a fresh breach of defendant's alleged duties within a three- or four-year limitations period (*id*., §§ 338, subd. (a), 343).[10] (See *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [An order sustaining a demurrer without leave to amend should be reversed if there is a "reasonable possibility that the defect can be cured by amendment"]; *Flood v. Simpson* (1975) 45 Cal.App.3d 644, 647 ["It is the general policy that courts should exercise liberality in permitting the filing of supplemental pleadings [under Code of Civil Procedure section 464] when the alleged 'occurring-after' facts are pertinent to the case"].)

In summary, the statute of limitations for a traditional mandamus action is determined "by the nature of the underlying right or obligation that the action seeks to enforce." (*Green v. Obledo* (1981) 29 Cal.3d 126, 141, fn. 10.) "To determine whether

---

[10]Defendant freely admits conducting "hydraulic testing of the fish ladder at C-H Dam," but its briefs state the testing occurred in 2022. However, defendant's record citations all indicate the year was 2023. Plaintiff's original pleading was filed in September 2022, so either date would fall well within a three- or four-year statute of limitations. If the fish ladder was opened and closed in both 2022 and 2023, those circumstances would further demonstrate the recurring nature of the alleged misconduct.

the continuous accrual doctrine applies here, we look … to the nature of the obligation allegedly breached." (*Aryeh v. Canon Business Solutions, Inc.*, *supra*, 55 Cal.4th at p. 1200.) Plaintiff seeks to enforce statutory duties of a continuing nature that are "susceptible to recurring breaches." (*Ibid*.) Those circumstances, along with allegations of ongoing and/or recurring breaches of those duties, permit reliance upon a continuous accrual theory and defeat an untimeliness challenge on demurrer. (*Id*. at p. 1201.) Moreover, analogous claims were held to be "outside the ambit of [Code of Civil Procedure sections 338 and 343]" in *California Trout*, *supra*, 207 Cal.App.3d at page 628. Plaintiff's cause of action is not time barred on the face of the pleadings or by judicial notice of the parties' evidence. The trial court erred by concluding otherwise.

### G.    Nonjoinder of Parties

"As the petition in a mandamus proceeding serves as the complaint, it must name all of the parties." (*Tracy Press*, *Inc. v. Superior Court* (2008) 164 Cal.App.4th 1290, 1297.) Code of Civil Procedure section 430.10, subdivision (d) authorizes a demurrer on the ground of "a defect or misjoinder of parties." This language encompasses nonjoinder of necessary and indispensable parties. (See *Organizacion Comunidad de Alviso v. City of San Jose* (2021) 60 Cal.App.5th 783, 791; *Van Zant v. Apple Inc.* (2014) 229 Cal.App.4th 965, 973.)

The trial court cited "failure to join indispensable parties" as the basis for sustaining the demurrer to plaintiff's cause of action for public nuisance, but not for the mandamus cause of action. The reason why is not apparent. Defendant argues, somewhat impliedly, that the court must have reached the same conclusion with regard to both claims. As we now explain, such a determination would not have been supported by the record before the trial court. The issue of necessary and indispensable parties was/is premature given (1) the pleaded allegations and (2) the limited purpose for which the parties' judicially noticed evidence can been used.

### 1. Relevant Law

The determination of whether a party is indispensable is governed by Code of Civil Procedure section 389. (*County of San Joaquin v. State Water Resources Control Bd*. (1997) 54 Cal.App.4th 1144, 1149.) The statute describes a two-part test. Subdivision (a) provides the criteria for who should be included in the lawsuit if joinder is possible, "sometimes referred to as 'necessary' parties." (*County of San Joaquin*, at p. 1149.) "A determination that a person is a necessary party is the predicate for the determination whether he or she is an indispensable party." (*TG Oceanside*, *L.P. v. City of Oceanside* (2007) 156 Cal.App.4th 1355, 1365.)

A party is considered necessary if:

"(1) in his absence complete relief cannot be accorded among those already parties or"

"(2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may"

"(i) as a practical matter impair or impede his ability to protect that interest or"

"(ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest." (Code Civ. Proc., § 389, subd. (a).)

If a party is deemed necessary but cannot be joined, (e.g., because the court does not have jurisdiction over the party), the court must then determine "whether in equity and good conscience the action should proceed among the parties before it" or should be dismissed because the absent parties are "indispensable." (Code Civ. Proc., § 389, subd. (b).)

"The factors to be considered by the court include:"

"(1) to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties;"

"(2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided;"

"(3) whether a judgment rendered in the person's absence will be adequate;"

"(4) whether the plaintiff or cross-complainant will have an adequate remedy if the action is dismissed for nonjoinder." (Code Civ. Proc., § 389, subd. (b).)

Failure to join an indispensable party is not a jurisdictional defect, even in a writ proceeding. (*Doe v. Regents of University of California* (2022) 80 Cal.App.5th 282, 305.) Put differently, it "'does not deprive a court of the power to make a legally binding adjudication between the parties properly before it.'" (*Ibid.*) The consequence of nonjoinder is that indispensable parties are not bound by the judgment. (*Ibid.*) ""'It is for reasons of equity and convenience, and not because it is without power to proceed, that the court should not proceed with a case where it determines that an 'indispensable' party is absent and cannot be joined."'" (*Tracy Press, Inc. v. Superior Court*, *supra*, 164 Cal.App.4th at pp. 1298–1299.)

### 2.    *Analysis*

"Whether a party is necessary and/or indispensable is a matter of trial court discretion in which the court weighs 'factors of practical realities and other considerations.'" (*Hayes v. State Dept. of Developmental Services* (2006) 138 Cal.App.4th 1523, 1529.) The standard of review is abuse of discretion. (*Ibid.*; *TruConnect Communications, Inc. v. Maximus Inc.* (2023) 91 Cal.App.5th 497, 515.) However, the trial court's determination is inherently fact intensive. (See *Verizon California Inc. v. Board of Equalization* (2014) 230 Cal.App.4th 666, 680–681.) "Whether the absent [parties] claim an interest in the subject of the action, whether that interest will be impaired, and whether they have the ability to protect their interests are questions of fact that are reviewed for substantial evidence." (*Id.* at p. 681.) Those are

just examples. Substantial evidence must support all factual findings made in relation to the factors listed in Code of Civil Procedure section 389.

In ruling on plaintiff's nuisance claim, the trial court found three absent parties were indispensable: National Marine Fisheries Service, United States Fish and Wildlife Service, and FERC. Although no explanation was provided for those findings, we must "presume that the trial court considered the relevant factors" (*Dreamweaver Andalusians, LLC v. Prudential Ins. Co. of America* (2015) 234 Cal.App.4th 1168, 1177) and imply all findings necessary to support the judgment. However, the doctrine of implied findings has limited application here given the need for substantial evidence to support *factual* determinations implicitly made at the *pleading stage*.

"A demurrer, by its very nature, involves no issue of fact. For example, a defendant cannot make allegations of fact in his demurrer which, if true, would disclose a defect in the complaint. [Citation.] Nor can he strengthen the demurrer by asserting evidence which would make the complaint defective." (*Hayward v. Henderson* (1979) 88 Cal.App.3d 64, 71.)

Nonjoinder as a ground for demurrer must appear on the face of the pleading or "matter of which the court is required to or may take judicial notice." (Code Civ. Proc., § 430.30, subd. (a).) Otherwise "the objection may be taken by answer." (*Id.*, subd. (b).) Thus, "a defendant may not make allegations of defect or misjoinder of parties in the demurrer if the pleadings do not disclose the existence of the matter relied on; such objection must be taken by plea or answer." (*Harboring Villas Homeowners Assn. v. Superior Court* (1998) 63 Cal.App.4th 426, 429.)

"The fact that [litigants] have raised their objections to nonjoinder of parties by demurrer … does not necessarily require that the trial court make an immediate determination of what parties, if any, must ultimately be joined." (*Union Carbide Corp. v. Superior Court* (1984) 36 Cal.3d 15, 22.) "'A joinder question should be decided with reasonable promptness, but decision may properly be deferred if adequate information is

59.

not available at the time. Thus the relationship of an absent person to the action, and the practical effects of an adjudication upon him and others, may not be sufficiently revealed at the pleading stage; in such a case it would be appropriate to defer decision until the action was further advanced.'" (*Ibid.*)

"A demurrer is particularly unsuited to resolving questions of fact regarding the misjoinder of parties because 'a demurrer lies only for defects appearing on the face of the pleadings.'" (*Verizon California Inc. v. Board of Equalization*, *supra*, 230 Cal.App.4th at p. 680.) In *Verizon California Inc.*, the pleadings "did not disclose the existence of the facts on which" the defendant relied to argue certain absent parties were necessary and indispensable. On appeal, it was determined "there was no substantial evidence to support the trial court's finding that the absent [parties] claimed an interest in the subject of the action that would be impaired if they were omitted from the action." (*Id.* at p. 681.) "Consequently, the trial court abused its discretion in sustaining the demurrer." (*Ibid.*)

Here, the operative pleading does not facially establish the necessity of joining the federal agencies referenced therein or show they are "indispensable" parties. Such a determination could only have been made—assuming it *was* made as to the mandamus claim—by judicially noticing the parties' evidence for the truth of its contents, interpreting the evidence, and then weighing the evidence to make factual findings and conclusions. We have already explained why that is improper.

To recapitulate, "[t]aking judicial notice of a document is not the same as accepting the truth of its contents or accepting a particular interpretation of its meaning." (*Joslin v. H.A.S. Ins. Brokerage* (1986) 184 Cal.App.3d 369, 374.) "When judicial notice is taken of a document, … the truthfulness and proper interpretation of the document are disputable." (*StorMedia Inc. v. Superior Court*, *supra*, 20 Cal.4th 449, 456, fn. 9.) "Utilizing judicially noticed documents in ruling on a demurrer is only proper when the

60.

documents are not used to determine disputed factual issues." (*Richtek USA*, *Inc. v. uPI Semiconductor Corp.* (2015) 242 Cal.App.4th 651, 653–654.)

Likewise, "the taking of judicial notice of the official acts of a governmental entity does not in and of itself require acceptance of the truth of factual matters which might be deduced therefrom, since in many instances what is being noticed, and thereby established, is no more than the existence of such acts and not, without supporting evidence, what might factually be associated with or flow therefrom." (*Cruz v. County of Los Angeles* (1985) 173 Cal.App.3d 1131, 1134.) "While courts take judicial notice of public records, they do not take notice of the truth of matters stated therein." (*Herrera v. Deutsche Bank National Trust Co*. (2011) 196 Cal.App.4th 1366, 1375.)

""""A demurrer is simply not the appropriate procedure for determining the truth of disputed facts." [Citation.] The hearing on demurrer may not be turned into a contested evidentiary hearing through the guise of having the court take judicial notice of documents whose truthfulness or proper interpretation are disputable.'" (*Fremont Indemnity Co. v. Fremont General Corp.*, *supra*, 148 Cal.App.4th at pp. 113–114.) Yet it appears that is exactly what happened in this case. Having generally explained why dismissal of the mandamus action cannot be affirmed for nonjoinder of parties, we address defendant's specific arguments regarding the parties it alleges are necessary and indispensable.

### (a) California Department of Fish and Wildlife

Defendant argues CDFW is a necessary and indispensable party to this case. There is a problem with this argument as a ground for demurrer: CDFW *is* a party to the case. As a named real party in interest, CDFW has/had a right to be heard. (See Code Civ. Proc., §§ 1089, 1089.5; *Sonoma County Nuclear Free Zone '86 v. Superior Court* (1987) 189 Cal.App.3d 167, 173.) CDFW acknowledged receipt of service of the writ

petition but chose not to respond. It has since filed an amicus curiae brief in support of plaintiff's appeal.

Defendant's argument that CDFW must be named as a respondent in the mandamus action is not persuasive. First, the trial court made no such finding. In ruling on defendant's demurrer to the *second* amended complaint/petition, the trial court sustained it for "failure to name indispensable parties, specifically CDFW, FERC, USFWS, and NMFS." When ruling on the demurrer to the operative third amended complaint/petition, after plaintiff had named CDFW as a real party in interest, the only parties identified by the trial court as necessary and indispensable were the federal agencies.

Second, a "writ may only issue against a respondent with a clear duty to perform a ministerial act and with a legal authority to discharge that duty." (*Sonoma County Nuclear Free Zone '86 v. Superior Court*, *supra*, 189 Cal.App.3d at p. 178.) Plaintiff is not seeking to compel any action by CDFW, nor does plaintiff allege CDFW shares any of the duties in question with defendant. Plaintiff alleges the opposite. Paragraph 37 of the operative pleading contends: "Agencies with regulatory oversight of fish species and habitat on the Merced River are not responsible for the maintenance and operation of Merced [Irrigation District's] fishway. That is the duty of the dam owner." Legal contentions in a pleading need not be accepted as true, but this one is supported by legal authority. (See Fish & G. Code, § 5935; *Goddard v. Department of Fish & Wildlife*, *supra*, 243 Cal.App.4th at p. 366 [observing CDFW "exists to enforce the Fish and Game Code [citation], not to exercise control over dams"].)

Defendant repeatedly cites to *Center for Biological Diversity*, *Inc. v. FPL Group*, *Inc.* (2008) 166 Cal.App.4th 1349 (*FPL Group*), which is distinguishable. There, private party plaintiffs sued private party owners of energy-producing wind turbines. It was alleged the defendants, "by the operation of their wind turbines, [were] responsible for killing and injuring raptors and other birds in violation of the public trust doctrine." (*Id.*

62.

at p. 1354.)  The plaintiffs sought declaratory and injunctive relief.  (*Id*. at p. 1356.)  A judgment on the pleadings was entered in favor of the defendants.  (*Id*. at p. 1359.)

The appeal in *FPL Group* was "directed solely to the propriety of the [trial] court's ruling … that '[n]o statutory or common law authority supports a cause of action by a private party for violation of the public trust doctrine arising from the destruction of wild animals.'"  (*FPL Group*, *supra*, 166 Cal.App.4th at p. 1356.)  Most of the opinion is devoted to explaining why the trial court erred in that regard.  (*Id*. at pp. 1360–1370.)  The remainder explains the reason for affirming the judgment despite that error:  the lawsuit was filed "against the wrong parties."  (*Id*. at p. 1367.)

The *FPL Group* defendants operated their wind turbines under the authority of permits issued by the Alameda County Board of Supervisors.  The issuance of those permits was a matter of public controversy, and the appellate court took judicial notice of various administrative and judicial proceedings related thereto.  (*FPL Group*, *supra*, 166 Cal.App.4th at pp. 1354–1358.)  "Although other public interest groups dissatisfied with the action taken by the Alameda County Board of Supervisors filed petitions for a writ of mandate challenging that action … plaintiffs filed no writ proceedings and did not proceed against any of the public agencies."  (*Id*. at pp. 1368–1369.)

The appellate court in *FPL Group* relied on the judicial abstention doctrine, which we discuss in the next part of this opinion.  On the issue of necessary parties, Merced Irrigation District relies on the following statements:  "A challenge to the permissibility of defendants' conduct must be directed to the agencies that have authorized the conduct. If plaintiffs believe that the board of supervisors or any other agency or subdivision of the state has failed to discharge its responsibilities under the public trust, they may bring an appropriate action against those agencies.  … But there is no basis for recognizing an action that is not directed against the appropriate state agency responsible for authorizing the wind farm operations."  (*FPL Group*, *supra*, 166 Cal.App.4th at p. 1370, fns. omitted.)

Merced Irrigation District repeats its mantra that CDFW authorized it to close the fish ladder in 1970, so CDFW is the party responsible for the fish ladder remaining closed. As we have explained several times, MID's affirmative defense of legal justification for statutory noncompliance involves disputed issues of fact. The undisputed facts do not conclusively show whether MID's present and ongoing noncompliance is authorized by CDFW or is otherwise legally excused.

For example, MID strenuously argues that CDFW has "never ordered [it] to reopen the fish ladder." That may (or may not) be literally true, but in a letter from CDFW to MID in January 2023, MID was told it had a "present and ongoing legal obligation to provide fish passage." CDFW's admonishment included a citation to Fish and Game Code sections 5901 and 12025.1. In the amicus curiae brief, CDFW argues "the record reflects [its] *dis*approval of the ongoing closure" of the fish ladder. The judicially noticed documents are certainly susceptible of that interpretation.

In response to CDFW's brief, MID attempts to reframe the pleadings by insisting plaintiff's lawsuit challenges CDFW's exercise of prosecutorial discretion in not enforcing the fishway statutes itself. As support for this argument, MID contends *Los Angeles Waterkeeper v. State Water Resources Control Bd.* (2023) 92 Cal.App.5th 230 is "directly applicable." We disagree.

In *Los Angeles Waterkeeper*, a private interest group sought writs of mandamus to compel certain performance by two public agencies, one of which was the State Water Resources Control Board. (*Los Angeles Waterkeeper v. State Water Resources Control Bd.*, *supra*, 92 Cal.App.5th at pp. 245–248.) MID purports to rely on holdings concerning the SWRCB. The claims against the SWRCB pertained to a "highly discretionary" duty relating to its investigatory and enforcement powers. (*Id.* at p. 277.) The relevant holding on appeal was "that when an agency has broad discretion in directing its investigatory and enforcement resources, its choice to direct those resources

at some potential violations and not others is [not] subject to review on mandamus." (*Id*. at pp. 282–283.)

Plaintiff is very clearly not seeking to compel the California Department of Fish and Wildlife to exercise its regulatory enforcement powers in a particular way. Plaintiff is not attempting to compel CDFW to do anything. The relief sought is mandated compliance by Merced Irrigation District with nondiscretionary duties imposed by statute. Nothing in the pleadings or judicially noticed documents conclusively shows CDFW to be a necessary *respondent* in the mandamus action.

### (b)     The Federal Agencies

Defendant's arguments regarding FERC, NMFS and USFWS are carefully worded to sound impressive and convincing, but when scrutinized they contain little substance. For example, these agencies are said to have "regulatory and approval authority over operations and impacts of the fish ladder." That particular statement is made without a supporting citation.

Elsewhere defendant makes the following assertion: "MID's ability to reopen and operate the fish ladder is dependent, at least in part, on the approval and authority of FERC, NMFS, [and] USFWS…. (12 CT 3506-3587; 13 CT 3608– 3684; 13 CT 3695-3727.)" Block citations to the record are neither appropriate nor helpful. (*Bullock v. City of Antioch* (2022) 78 Cal.App.5th 407, 422; *Bernard v. Hartford Fire Ins. Co.* (1991) 226 Cal.App.3d 1203, 1205.) The first of those citations is to FERC's 2015 FEIS for the Merced River Project and Merced Falls project. Even if the contents were judicially noticeable for their truth, we fail to see how they show defendant cannot reopen the fish ladder without the approval of FERC, NMFS, and/or USFWS. The second block citation is to a series of letters exchanged between 2014 and 2022. Notwithstanding the limited purpose for which judicial notice of these letters is allowed, we again fail to see the support. The last block includes a 2011 letter from MID to NMFS declining a request to

open the fish ladder for testing, and correspondence from 2023 alleging MID reopened the fish ladder for testing but reclosed it again despite NMFS's request that it be kept open.

Even if the contents of all judicially noticed documents were considered for their truth, and assuming they could be interpreted to support defendant's position, the evidence as a whole could also be viewed as supporting plaintiff's position. That is especially true with regard to defendant's alleged inability to reopen the fish ladder without the direction and consent of the federal agencies. The evidence could be viewed as showing those agencies tried for over a decade to coax, cajole, and incentivize defendant to reopen the fish ladder because they lacked the power to compel such performance.

Defendant provides no legal authority showing the federal agencies have control over its operation of the C-H Dam. Defendant argues NMFS and USFWS have jurisdiction "over certain fish species under the Endangered Species Act." This is true. The argument, which the trial court seemed receptive to earlier in the case, is that reopening the fish ladder could actually do more harm than good for the fish. That would potentially subject defendant to liability under the ESA. But defendant relies on the truth of the 2007 Vogel report, which is not judicially noticeable for that purpose, and there is other evidence in the record that is conflicting.

It is also hard to ignore NMFS's staunch advocacy for "expeditious reopening of the fish ladder at Crocker-Huffman Dam." After this lawsuit was filed, NMFS sent a letter to MID containing the following statement: "As has long been NMFS's stated view, reopening the fish ladder at Crocker-Huffman Dam would promote the conservation of anadromous salmonids in the Merced River …."

Under the joinder statute, "a party claiming an interest relating to the subject of the action may be deemed necessary if the disposition of the action in [the party's] absence may 'leave any of the persons already parties subject to a *substantial risk* of incurring

66.

double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.'" (*Van Zant v. Apple Inc.*, *supra*, 229 Cal.App.4th at p. 977, quoting Code Civ. Proc., § 389, subd. (a).) Speculative contentions are insufficient. (*Van Zant*, at p. 977.) "'[A] "substantial risk" means more than a theoretical possibility of the absent party's asserting a claim that would result in multiple [or inconsistent] liability. The risk must be substantial as a practical matter.'" (*Ibid*., quoting *Union Carbide Corp. v. Superior Court*, *supra*, 36 Cal.3d at p. 21.)

Aside from allegedly possible inconsistent obligations, and unsubstantiated claims about control, defendant's briefing is peppered with generalities about the agencies having an interest in matters related to the fish ladder. For example, defendant claims "USFWS has taken an active interest in fish passage issues at C-H Dam." Merely having an "interest" does not make a party's involvement necessary or indispensable. A necessary party is one who "claims an interest relating to the subject of the action *and* is so situated that the disposition of the action in his absence may … as a practical matter impair or impede his ability to protect that interest …." (Code Civ. Proc., § 389, subd. (a), italics added.) Plaintiff has argued the relief it seeks will promote and further the interests of the federal agencies, and some of the judicially noticed evidence can certainly be viewed as corroborative.

To reiterate, the joinder issue is premature and cannot be resolved by judicially noticing volumes of evidence that is open to conflicting interpretations. Defendant is free to assert nonjoinder as an affirmative defense when answering the petition. The trial court can then decide the issue on the merits, based on admissible evidence, at an appropriate stage of the proceedings. (See *Union Carbide Corp. v. Superior Court*, *supra*, 36 Cal.3d at p. 24; *Harboring Villas Homeowners Assn.*, *supra*, 63 Cal.App.4th at pp. 429–430 ["a trial court does not have to make an immediate determination of what parties must be joined at the pleading stage"].)

### (c) California State Water Resources Control Board

Defendant cursorily argues SWRCB is another necessary and indispensable party. The trial court never found, even in its earlier demurrer rulings, that SWRCB is a necessary or indispensable party to the action. Defendant does not explain how SWRCB's absence would preclude complete relief from being granted as between plaintiff and defendant, nor how the relief sought creates a substantial risk of defendant having liability or inconsistent obligations vis-à-vis SWRCB, nor how SWRCB's absence would impair or impede SWRCB's ability to protect its own interest in the outcome of the case. (Code Civ. Proc., § 389, subd. (a).)

Furthermore, an "indispensable" finding would require a showing SWRCB is not only a necessary party, but for some reason "cannot be made a party" to the case. (Code Civ. Proc., § 389, subd. (b).) Defendant does not address this issue. As previously noted, defendant may plead nonjoinder as an affirmative defense when it responds to the petition for writ of mandate.

### H. Judicial Abstention

"Under the doctrine of judicial abstention, a trial court has discretion to abstain from adjudicating an action if: (1) "'"granting the requested relief would require a trial court to assume the functions of an administrative agency, or to interfere with the functions of an administrative agency"'"; (2) the action "'"involves determining complex economic policy, which is best handled by the Legislature or an administrative agency"'"; or (3) "'"granting injunctive relief would be unnecessarily burdensome for the trial court to monitor and enforce given the availability of more effective means of redress."'"" (*People ex rel. Elliot v. Kaiser Foundation Health Plan*, *Inc.* (2024) 105 Cal.App.5th 1114, 1128.)

Judicial abstention applies only in cases of equity and is a recognized ground for demurrer in such actions. (*Shuts v. Covenant Holdco LLC* (2012) 208 Cal.App.4th 609, 625; see *Arce v. Kaiser Foundation Health Plan*, *Inc.* (2010) 181 Cal.App.4th 471, 481–

68.

482.)  A trial court decision to abstain is reviewed for abuse of discretion.  (*Arce*, at p. 482.)  In this case, however, the trial court did not make an abstention ruling.

The ruling on defendant's demurrer to the first amended complaint/petition included the following explanation:  "A ruling on the demurrer on the grounds of the doctrine of abstention is DEFERRED AS MOOT given the above rulings [on] the other demurrers raised by Defendant.  The doctrine of abstention will be addressed *if and when* Plaintiff has otherwise stated a valid claim."  (Italics added.)  Because the trial court never found any of plaintiff's causes of action to be viable, the record does not permit the inference of implied reliance upon the abstention doctrine in sustaining the operative third amended complaint/petition.

Defendant continues to argue abstention principles, seemingly expecting this court to decide the issue de novo.  It is uncommon for the appellate courts of this state to invoke the judicial abstention doctrine sua sponte.  The *FPL Group* case relied upon by defendant is a rare example of it being done.  There, however, abstention was one of two reasons cited for affirming a judgment of dismissal.  The other, as previously discussed, was because the lawsuit was "brought against the wrong parties."  (*FPL Group*, *supra*, 166 Cal.App.4th at p. 1367; see *id.* at p. 1372.)

For many of the reasons discussed regarding the joinder issue, we will not make findings and conclusions on the propriety of judicial abstention in the first instance.  Neither the pleadings nor mere judicial notice of the parties' evidence allow us to render a fully informed decision on the issue.  Defendant is not precluded from raising this issue again as the matter proceeds in the trial court.

## I.    Federal Preemption

In its amicus curiae brief, the California Department of Fish and Wildlife discusses federal law out of concern this court might consider whether the Federal Power Act preempts state law—Fish and Game Code sections 5901, 5935, and 5936—with

specific regard to the C-H Dam. Merced Irrigation District, in response, states "CDFW does not appear to understand MID's position," and submits CDFW's briefing on the subject is "misplaced, unnecessary and unrelated" to the issues before us. It appears CDFW and MID are in agreement that we should not decide any federal preemption issues.

Frankly, MID's position is not as clear as it purports to have made it. At page 37 of the respondent's brief, MID seemingly alleges the operative pleading is somehow deficient with regard to federal preemption, and specifically concerning the Federal Power Act. On the very same page, however, MID writes, "[Plaintiff] is correct—as MID has continuously acknowledged—that FERC has determined to date that the C-H Dam is not directly or expressly part of the hydroelectric projects subject to relicensing on the Merced River, and thus its jurisdiction." But *that* sentence is immediately followed by this one: "The fact remains, however, that the ongoing FERC relicensing process has involved and will involve actions regulating fish passage at C-H Dam, and federal authority and jurisdiction over this issues [*sic*] preempts this Court's consideration of those issues." The last quoted statement is made without citation to authority.

Despite MID's occasional use of the word "preempted" (and variations thereof), it does not appear MID is making any federal preemption claims. In the response to CDFW's brief, MID explains that it "brought the ongoing FERC proceeding to the trial court's attention in further support of its argument that the court should abstain from considering [plaintiff]'s claims because there were other agencies already considering fish passage at the [C-H] Dam in another forum." In other words, MID contends the federal agencies should be considered indispensable parties because of the "collaborative process" that has allegedly taken place in connection with the federal relicensing applications.

70.

We have already discussed the Federal Power Act and explained the significance of whether the C-H Dam is or is not part of a FERC-licensed project. It suffices for us to conclude the operative pleading does not facially reveal a federal preemption defect. Plaintiff alleges, and defendant agrees for purposes of demurrer, the C-H Dam is not a federally licensed facility or otherwise part of a "project" as defined by the FPA.

"[W]hile preemption 'can' be decided on demurrer in a proper case, [any] implication that it should be decided on demurrer is erroneous. There are numerous circumstances in which the facts must be determined in order to decide whether a claim is preempted by federal law, and it is not uncommon to have preemption claims decided based on an evidentiary showing. Indeed, preemption is an affirmative defense as to which defendants have the burden of proof." (*Apollo Capital Fund LLC v. Roth Capital Partners*, *LLC* (2007) 158 Cal.App.4th 226, 250–251.) Accordingly, we make no further determinations regarding federal preemption.

### J.  Exhaustion of Administrative Remedies

The exhaustion of administrative remedies "is a term of art that refers to the requirement that administrative remedies be pursued as a jurisdictional prerequisite to seeking judicial relief from an administrative action." (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1148.) "When seeking relief under traditional mandamus, the exhaustion requirement speaks to whether there exists an adequate legal remedy." (*Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 620; see Code Civ. Proc., § 1086.) "If an administrative remedy is available and has not yet been exhausted, an adequate remedy exists and the petitioner is not entitled to extraordinary relief." (*Unnamed Physician*, at p. 620.)

"'The rule that a party must exhaust his administrative remedies prior to seeking relief in the courts "has no application in a situation where an administrative remedy is unavailable or inadequate."'" (*Ramos v. County of Madera* (1971) 4 Cal.3d 685, 691.)

71.

The operative pleading alleges there is "no administrative procedure established for the reopening of a fishway." Relatedly, there are allegations that "[n]either the Crocker-Huffman Dam nor its fishway is part of any administrative process by any other agency and … [¶] [t]here is no federal or state administrative or regulatory process with the capacity to compel Merced [Irrigation District] to reopen the fishway."

Defendant claims the allegations are insufficient, and "plaintiff should have but failed to exhaust any of the remedies available to it." However, defendant declines to specify what the available remedies are/were. It contends "numerous regulatory agencies … are engaging in processes and proceedings to address fish passage at C-H Dam," and the pleading is defective for not alleging efforts "to participate in these processes or present … claims to CDFW and the other agencies in the course of or in connection with these ongoing regulatory processes and proceedings."

The unspecified "processes and proceedings" are/were apparently different from the federal relicensing proceedings for the Merced River Project and Merced Falls Project, in which plaintiff "also" failed to "allege or establish" its participation. Those federal proceedings supposedly afforded "opportunities for comments and remedies for challenging FERC determinations regarding fish passage issues and C-H Dam," even though defendant elsewhere concedes FERC does not have federal licensing jurisdiction over the C-H Dam. We do not find these arguments convincing.

"The mere possession by some official body of a continuing supervisory or investigatory power does not itself suffice to afford an administrative remedy unless the statute or regulation under which that power is exercised establishes clearly defined machinery for the submission, evaluation and resolution of complaints by aggrieved parties." (*Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1552–1553; accord, *Common Cause v. Board of Supervisors*, *supra*, 49 Cal.3d at p. 441.) Courts have thus "declined to impose an exhaustion requirement when a purported administrative remedy did not incorporate 'clearly defined machinery

72.

for the submission, evaluation and resolution of complaints by aggrieved parties.'" (*Hill RHF Housing Partners*, *L.P v. City of Los Angeles* (2021) 12 Cal.5th 458, 479.) Furthermore, "[e]ven when exhaustion of administrative remedies is required, there may be factual issues that may not be resolved on demurrer." (*TracFone Wireless*, *Inc. v. County of Los Angeles*, *supra*, 163 Cal.App.4th at p. 1363, fn. 2.)

On the record before us, we are not convinced plaintiff was required to prove a negative on demurrer with regard to the exhaustion requirement. At the very least, there are disputed issues of fact concerning the existence and adequacy of administrative remedies. As such, plaintiff sufficiently pleaded the nonexistence of a "plain, speedy, and adequate remedy" by means other than a writ of mandate. (Code Civ. Proc., § 1086.)

## DISPOSITION

The judgment of dismissal is reversed. The order sustaining the demurrer to the third amended complaint and petition for writ of mandate is affirmed as to the cause of action for public nuisance and reversed as to the cause of action for traditional mandamus. The parties shall bear their own costs on appeal.

PEÑA, Acting P. J.

WE CONCUR:

DE SANTOS, J.

FAIN, J.[†]

---

[†]Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

73.

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| WATER AUDIT CALIFORNIA,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>MERCED IRRIGATION DISTRICT,<br><br>Defendant and Respondent. | F088084<br><br>(Super. Ct. No. 22CV-03034) |

It appearing that part of the nonpublished opinion filed in the above entitled matter on May 13, 2025, meets the standards for publication specified in California Rules of Court, rule 8.1105(c), IT IS ORDERED that the opinion be certified for publication in the Official Reports with the exception of part I, part II.D, and parts II.G through J of Discussion.

PEÑA, Acting P. J.

WE CONCUR:

DE SANTOS, J.

FAIN, J.[*]

---

[*]Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.